In re Joshua John WIGGINS, Debtor.

Joshua John Wiggins, an incapacitated person by and through his guardians and his guardians and conservators, and David Hale & Eva Hale; and L.D. Fitzgerald, as Trustee in Bankruptcy, Plaintiffs,

v.

Peachtree Settlement Funding, Defendant.

Bankruptcy No. 99–40458.
Adversary No. 99–6212.

United States Bankruptcy Court,
D. Idaho.

Sept. 21, 2001.

John T. Lezamiz and Robyn M. Brody, Hepworth, Lezamiz & Hohnhorst, Twin Falls, ID, for Plaintiffs.

W. Cullen Battle and Jay F. Cobb, Fabian & Clendenin, Salt Lake City, Utah and Craig W. Christensen, Pocatello, ID, for Defendant.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I. Background

Joshua John Wiggins ("Joshua" or "Wiggins") filed for protection under Chapter 13 of the Bankruptcy Code on March 26, 1999. On September 13, 1999, acting by and through his parents, guardians and conservators, David and Eva Hale, Wiggins commenced this adversary proceeding against Defendant Peachtree Settlement Funding. The Chapter 13 Trustee, L.D. Fitzgerald, joined Wiggins as a party-plaintiff in the action on behalf of the bankruptcy estate.

A trial in the adversary proceeding was conducted by the Court sitting without a jury on May 10, 11, 17, and 18, 2001. Eight witnesses were called to testify in person at trial. Extensive deposition testimony, in both written and video format, was also included in the record. In addition, hundreds of pages of documents and other exhibits were received in evidence. When the record was complete, counsel for the parties were invited to make extensive oral closing arguments. Upon conclusion of the proceedings, all issues raised in this action were taken under advisement.

After a thorough review of the record, evidence and testimony, the Court intends that this Memorandum serve as its formal findings of fact and conclusions of law in this difficult case. Fed. R. Bankr.P. 7052.[1]

### II. Facts.

#### A. General Comments.

Before embarking upon the details of this action, some preliminary observations

---

1. The Court compliments counsel for the parties in this case. These advocates displayed a high degree of skill and professionalism in presenting what were, at times, emotionally charged positions concerning difficult legal issues in an efficient and effective manner.

are appropriate. In this contest, the parties took markedly different positions concerning several critical issues of fact. These versions of the facts were, at times, irreconcilable. In other words, according to the parties, depending upon the position taken, some witnesses who testified must be believed, while others could not be correctly recounting the crucial facts and events. As a result, some of the Court's findings that follow resolve disputed issues of fact to a varying degree. And while perhaps obvious under these circumstances, the Court starts its recitation of the material facts here by making clear that what follows represents the Court's assessment of the credibility of the various witnesses and its decision concerning the appropriate weight to be assigned to the witnesses' testimony.

While not always the situation, in this case, the Court's ability to observe the witnesses during testimony was extremely helpful and important. In some instances, the Court formed firm and definite impressions of the credibility of certain witnesses by watching them testify, by assessing their demeanor and reaction to questioning by counsel, either in the courtroom or via video testimony. Therefore, it should come as no surprise that based upon what the Court saw at trial, some witnesses seemed completely credible, while others were less so.

Moreover, while several thorny issues of fact may be highlighted in this Memorandum, others may not. Even though the Court may not in every instance provide a detailed analysis of the factors it considered in determining whether to adopt a particular witness's testimony or party's view of the facts concerning disputed issues, it should not be assumed the Court failed to engage in the balancing process inherent in deciding all conflicting fact issues.

Given this context, the important facts are summarized below.

## B. Joshua Wiggins.

Joshua Wiggins was an active, happy, intelligent sixteen-year-old in December, 1994. He was a good student, healthy, and participated in a variety of activities at school and through his church. Joshua lived at home near the small farming community of Heyburn, Idaho, with his mother and step-father, Eva and David Hale. David was a farmer; Eva was a service representative for the local telephone company. Joshua got along well with his parents and his many friends. In short, Wiggins' life as a teenager in rural southern Idaho was good.

On the night of December 22, coming home from a high school basketball game, things suddenly and permanently changed for Joshua. On that wintry evening, he was involved in a terrible automobile accident on a rural road near his home.

Another young man in the vehicle, Wiggins' friend, was killed. Joshua also nearly died from the severe head and other injuries he sustained in the wreck. As it turned out, he survived, but not without first dwelling in a coma for six days. While all were relieved that he lived and would, to a large degree, recover from his injuries, Joshua still to this day suffers the residual effects of the permanent and irreversible damage he sustained to the frontal lobe of his brain. And though the two medical experts who testified at trial disagree on some points, they both confidently concluded that, given his brain injury, Joshua has experienced, and will continue to experience, difficulty exercising basic "executive functioning" skills. These are the essential skills that allow humans to effectively problem-solve, reason, exercise judgment, organize, and plan. In addition, as a result of his injuries, Wiggins will

experience serious and potentially dangerous and destructive seizures unless he takes his medication.

After the accident, the Hales retained counsel to investigate the accident to determine if the family had a claim for damages for Joshua's personal injuries. While Wiggins' injuries were severe and permanent, and his medical expenses extensive, the family's prospects for a large recovery were dim. Because of his injuries, Wiggins could not remember how the accident occurred, the other boy in the vehicle at the time was killed, and there was an unresolved question as to who was driving at the time of the accident.

After considerable efforts, the family's lawyers were able to negotiate a settlement to partially compensate for Wiggins' injuries. Under this arrangement, Wiggins was to receive a total of $150,000. Because the Hales wanted Joshua to be protected and secure in his future, it was decided that this settlement money should be "structured" and payable over time. It was decided Wiggins should receive a lump sum of $50,000 from State Farm Insurance Company, the insurer for the adverse party, and another $5,852 from his own underinsured motorist coverage through Unigard Security Insurance Company. Plaintiffs' Exhibit 8, p. 3. In addition, Unigard agreed to purchase an annuity for Wiggins' benefit. This annuity provided for payments to Joshua of $375 per month for the rest of his life, guaranteed for twenty years, beginning July 1, 1999. The amount of the monthly payments was to increase by two percent compounded annually. In addition, because the Hales

wanted Joshua to have the opportunity to attempt to obtain a college education, Wiggins was to receive three other lump sum payments of $3,600 each, payable on January 5 and August 5, 1998, and January 5, 1999, to help with his educational expenses. *Id.* at pp. 4–5. Unigard assigned its liability for these payments to Safeco Assigned Benefits Service Company, Plaintiffs' Exhibit 11, which in turn agreed to make the payments to Wiggins.

The settlement was formalized on February 22, 1997. By then Wiggins was 18 years old. Plaintiffs' Exhibit 8. While his mother and stepfather, together with his lawyers, provided guidance for his decision, as an adult, Joshua signed the settlement and release documents in his own name.[2] Included in the Release, Indemnification and Settlement Agreement was the following pronouncement:

> The periodic payments to be received by [Wiggins] pursuant to Paragraph III are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge or encumbrance by [Wiggins].

*Id.*, p. 7. Similar language is found in the Annuity Contract, too:

> No payment under this annuity contract may be accelerated, deferred, increased, or decreased, or anticipated, sold, assigned, or encumbered in any manner by the annuitant (or either joint annuitant) or any other recipient of the payment.

Plaintiffs' Exhibit 9, p. 3. Both David and Eva Hale testified these provisions were included in the settlement documents, at least in part, as a means to safeguard the

---

**2.** Defendant argues the fact Wiggins signed these documents with the concurrence of his family and attorneys is evidence of his competency to contract at this time. Of course, whether Wiggins was competent to execute the settlement documents in his own name in January, 1997, is not an issue the Court need

decide in this action. After considering the evidence and testimony concerning subsequent manifestations of Joshua's injuries, though, the Court is very skeptical regarding Wiggins' capacity to contract, and would discount any weight to be given to the fact he did so, or that his parents and lawyers approved.

annuity payments and Wiggins' future. In other words, given Joshua's condition, his parents were concerned about his ability to properly manage his finances. Eva Hale testified, and the Court believes her, that these anti-assignment provisions were "very important" and that she would not have wanted the settlement structured in the manner it was, or the annuity purchased, without these protections.

Though now a young adult, because of his injuries, Wiggins continued to live at home. As contemplated by Wiggins and the Hales, Joshua's annuity payments were paid directly into a joint bank savings account. Both Wiggins and his mother were signatories on the account. Mrs. Hale testified she believed the account was a "dual signature" account, requiring her consent for any withdrawals, rather than simply a joint account. However, the evidence suggests she was mistaken in this regard. As set up by the bank, apparently either Wiggins or Eva Hale could transact in the account proceeds separately. Defendant's Exhibit 104. At any rate, Mrs. Hale testified, and the Court accepts, that she intended the account be set up with her name on it, and requiring two signatures for withdrawals, to serve as an additional safeguard against Wiggins' possible imprudent disposition of his annuity payments.

Joshua had shown promise in his recovery and his mental capabilities after the accident. Nearly all of his physical abilities were now restored. Joshua and his parents were concerned about his future. In the fall of 1997, as he wished, the Hales agreed Wiggins should enroll in a vocational-technical program at Idaho State University in nearby Pocatello. The Hales were skeptical of his prospects for success at college, but wanted the best for Wiggins so he could get an education in hopes of making a better life. He had attempted college the year before, but Joshua had experienced considerable difficulty in organizing his time and in completing the course work. Unfortunately, when he returned to school, Wiggins again experienced trouble coping with life at college. Significantly, he also began having grand mal seizures. On these occasions, it was not uncommon for him to experience a loss of memory concerning events occurring several days both before and after his seizures. While these episodes could be avoided with medication, Wiggins lacked the mental discipline or was unable to remember to take his medicine. Joshua was treated by physicians in Pocatello during this time. He exhibited symptoms of depression and was frustrated by his condition. Under the circumstances, the Hales decided to withdraw Wiggins from school, and to bring him home in hopes of helping him monitor his health and deal with life's challenges.

### C. Peachtree and John Hodges, III.

These developments disappointed Joshua and his family. At home, as a young man, Wiggins grew restless and desired to be more independent. However, because of his condition, and its effect on his conduct, Joshua was unable to obtain and keep any sort of job. It was in the spring of 1998 when Wiggins apparently saw an advertisement on cable television concerning Defendant Peachtree Settlement Funding.

Defendant is a limited liability company founded in February 1997. Its offices are in Atlanta, Georgia. Its principals and managers were and are, for the most part, lawyers. In 1998, Defendant specialized in purchasing structured personal injury and other settlement payment streams for cash at what Defendant considered their discounted present value. Defendant then resold the settlements or annuities for a

profit. Through this process, recipients of future payments received a cash payment, albeit in a dramatically reduced amount when compared to the total of payments sold to Defendant.[3] After seeing the television ad, Wiggins began asking David Hale questions about the details of his structured settlement and annuity payments. While trying to fairly answer Joshua's questions, David Hale was concerned about Joshua's new-found interest in the subject, and pointedly told Wiggins that selling his annuity would not represent a good decision.

At about this same time, Eva Hale was diagnosed with a brain tumor and then thyroid cancer. She and Mr. Hale were required to travel frequently from Heyburn to Pocatello and Salt Lake City for surgeries and other medical treatments. During this time, Wiggins lived at home. Mr. and Mrs. Hale testified that under these difficult circumstances, it was not easy for the Hales to both supervise the activities of an unsettled Joshua while also dealing with Eva's daunting medical problems.

On May 12, 1998, in response to the television ads, Wiggins phoned Defendant's toll-free number and first encountered "account executive" John A. Hodges, III, who took his call. At this point, the Court will digress a bit to describe its impressions of Mr. Hodges, who as a critical witness, testified both in person and via video from a pretrial deposition.

While no personal offense is intended, the Court considers Hodges as quite the character. Outwardly, Hodges seems a personable, affable, and energetic fellow. Looking deeper, though, the Court was impressed with how driven Hodges apparently was concerning achieving his personal, and especially his financial, objectives. At thirty-one years of age, Hodges struck the Court as the consummate commission salesman, smooth in every respect. He was apparently accomplished at persuading his "clients" of their need for Defendant's services in connection with achieving their own financial and other goals. The Court observed that while at times during his testimony, Hodges seemed to exhibit genuine and personal concern about the circumstances of those with whom he dealt as a salesman for Defendant, at bottom, the Court suspects this concern was merely incidental to "doing the deal." Put another way, Hodges testified he wanted to become wealthy, and he obviously saw his job at Peachtree as a means to that end. He testified in his videotaped pre-trial deposition that in 1998, he earned $69,000, in 1999 he earned $75,000, and that in 2000, he was aiming even higher—for $100,000. The more profit he generated for his employer, the more money Hodges made for himself, and he was a significant producer for Defendant.[4] The record also suggests that, as evidenced by the training materials and counseling he received from his superiors at Peachtree, Defendant's management approved of Hodges' "go for it" attitude.

When it came to Hodges' dealings with Wiggins, because Joshua lacked the mental ability to make rational decisions, the Court finds Joshua had little chance of protecting his interests. If the purchase price paid him by Defendant for his annuity payments was to be a reasonable one from Wiggins' perspective, something the Court concludes it was not, considering

---

**3.** The testimony indicated Defendant endeavored to obtain the rights to future payments at a price representing a discount of 20–25% of the face value of the payments.

**4.** At one point in his testimony, Hodges proudly proclaimed that during 1999 he had closed over 100 transactions for Defendant earning his employer over $600,000 in gross profit.

Joshua's peculiar and vulnerable circumstances, it was mere coincidence, and only because that result was in line with Defendant's and Hodges' agenda.

### D. "Doing the Deal."

Wiggins allegedly told Hodges he was interested in getting some cash to buy a flashy car and to get an apartment. Hodges encouraged Wiggins' plans. To assist the young man in attaining these less-than-lofty goals, and on the basis of the minimal information obtained during this brief initial phone conversation, Hodges informed Wiggins that Defendant would promptly pay him $15,142 in cash for the purchase of Wiggins' right to receive 116 monthly annuity payments worth over $50,000.

Having dangled what must have been alluring bait indeed to a young man yearning to be independent, the same day Hodges sent Wiggins a lengthy, written "application" to Joshua to complete and to commit him to "the deal." Hodges also called Joshua frequently over the next few days to check on the status of Wiggins' return of the written materials. For example, he talked to Joshua twice on May 14, prompting Hodges to make the following contemporaneous entry in his computer telephone log, which to the Court demonstrates the manner in which Hodges handled Joshua Wiggins:

> 5/14/1998 12:52p—JAH—spoke with client and he had some second thoughts about the deal but his so called friend who is a financial advisor told him it was a bad deal. *I put his head back on the straight and narrow and got him focused on buying the car and getting ahead in life.* He said thanks for helping me out and he is sending out the information today.

Plaintiffs' Exhibit 2, p. 2 (emphasis added).

Wiggins completed and returned the written information on May 19. Then, on May 21, Hodges attempted to call Wiggins at home to follow-up on some of the paperwork. Eva Hale answered the phone. According to both Hodges and Mrs. Hale, when she learned the identity of the caller, Mrs. Hale became extremely upset. A memorable, but brief conversation followed. Both witnesses confirm Mrs. Hale yelled at Hodges. During this short, heated phone exchange, Mrs. Hale conveyed critical information to John Hodges, and through him, to Defendant. She told Hodges that Wiggins had spoken with his attorney who indicated selling the annuity payments would be illegal. Hodges admits hearing this statement. Eva Hale also testifies she told Hodges that Joshua was not going to sell his annuity payments to Defendant and that the Hales were adamantly opposed to the transaction. Plaintiffs' Exhibit 2, p. 2. Mrs. Hale testified that she also told Hodges to leave her son alone, and most importantly, that even though Wiggins was over eighteen years of age, he had experienced a serious head injury at age sixteen, would always function at a sixteen-year-old level mentally, and that Joshua could not make the deal.

Hodges disputes Mrs. Hale told him that Wiggins had suffered a head injury or that he functioned mentally as would a sixteen-year-old. To the Court, this is the most crucial issue of disputed fact presented by this action. Simply stated, the Court finds and concludes that Eva Hale's testimony, and not that of John Hodges, should be believed. Based upon the Court's observations of witness testimony, and considering the rest of the record, the Court declines to accept Hodges' denial that he learned this important information, and that had he been told such information, he would have abandoned his efforts to buy Joshua Wiggins' annuity payments. The Court believes Hodges was at that point in time

motivated by his sense that he was near to closing an advantageous deal netting Defendant a potential profit, and him a significant sales commission. In other words, the Court concludes that because it may have adversely impacted "doing the deal," Hodges was motivated both during his deposition and trial testimony to deny that he was told about the nature of Wiggins' injuries and the extent of his mental deficiencies.

There is no dispute, though, that Hodges was sufficiently impressed by his encounter with Eva Hale to make a remarkable, regrettable, entry in his computer log to evidence the May 21 conversation. This entry provides the reader a glimpse into Hodge's reaction to Eva Hale's warnings to him:

> 5/21/1998 4:42p—JAH—client called me and left a message for me to call him back. I called him and left a message with *some lady who I guess was his mother and she told me that he was not going to sell his payments and that his lawyer had advised him that this is illegal and he should not do it.* I told her to please just give me a call back. His parents are against this. *The guy is 20 years old and wants to access some of his funds to get a place and a car and his parents are but heads* [sic].

Plaintiffs' Exhibit 2, p. 2 (emphasis added). Hodges testified he laments his characterization of the Hales in this note. On this limited point, the Court believes Hodges wishes he had never recorded what the Court thinks were his actual impressions of the call and of Eva Hale. The Court does not accept Hodges' testimony, however, that had he been advised of Joshua's mental problems, he would have included such information in his log notes. Had he done so, Hodges' supervisors and Defendant's policies would have required that Hodges not pursue the transaction any

further. The Court finds instead, that Hodges' profit-motive was strong enough to cause him to omit this compelling information from the log.

Later on May 21, Wiggins returned Hodges' phone call. During the conversation Hodges decided he would thereafter only call Wiggins at a house where Wiggins' girlfriend was house-sitting, rather than at Joshua's (and his parents') home. Hodges also changed the address for sending further materials to Wiggins. He explained he made this change at Wiggins' request; Wiggins does not remember who made the suggestion. Hodges' phone log entry for this conversation reveals much concerning the reason for the change:

> 5/21/1998 5:21p—JAH—client called me back and let me know that he wants to do the deal and to screw his parents. He will get all of the paperwork overnighted to me tomorrow. He wants to drive up in his driveway with a brand new car and tell his parents to shove it. This guy is house sitting with his girlfriend until the 29th. He wants to get everything done before then.

Plaintiffs' Exhibit 2, p. 2. In other words, Hodges now had a plan to circumvent Wiggins' parents' opposition to his dealings with Joshua.

After Eva's telephone encounter with John Hodges on May 21, no further mailings or calls to the Hale home from Defendant's salesman occurred. Therefore, Mr. and Mrs. Hale both believed Hodges had heeded Eva Hale's warnings and Wiggins' communications with Defendant had ceased. In fact, however, over the next month and a half or so, a regular course of written and phone contacts occurred between Wiggins and Hodges. Before buying his settlement payments, Defendant's various employees learned much about Wiggins, his settlement, and his situation. For example, on June 22, 1998, Defendant

received a copy of a document which indicated the nature of Wiggins' injury was a "head injury resulting from 12/94 car accident." Plaintiffs' Exhibit No. 20. This information was retained in Defendant's legal department. In addition, prior to closing the Wiggins deal, Hodges, and therefore Defendant, were aware that despite being twenty years old, Wiggins lived at home, and was unemployed. Plaintiffs' Exhibit 1, p. 0000193; Plaintiffs' Exhibit 23.

Eventually Hodges and Defendant offered to purchase Wiggins' right to receive 116 monthly payments and one lump sum payment of $3,600 due on January 5, 1999, under the annuity for a total of $17,699 cash. Wiggins agreed. According to Defendant's records, the face value of this stream of payments was $54,681, resulting in a gross profit to Defendant of $36,982. Defendant's cash offer is based upon a discount rate of 23.05%. Transaction Closing Form, Plaintiffs' Exhibit 21a.

On June 1, 1998, Wiggins signed a truly massive set of papers referred to as a "Purchase Agreement" which had been prepared by Defendant's lawyers to document the parties' deal. As might be expected, this formidable set of documents is replete with complicated legal terminology and provisions designed to insulate Defendant from any possible claim of impropriety. After reviewing this contract, the Court suspects even a seasoned lawyer may have difficulty deciphering its terms. So voluminous were these documents that some of Defendant's staff referred to this paperwork as "the book." After complying with all of Defendant's requests for information, the purchase transaction was finally funded on July 9, when Defendant sent a check to Wiggins. Defendant's Exhibit 106.

### E. The Deal Unravels.

After the transaction closed and Wiggins received the $17,699 check, he immediately purchased a used red 1994 Pontiac Trans Am from a local dealer on what seems to the Court patently unfavorable terms. The purchase price for the used car was $17,995. He also agreed to buy extended warranty coverage, credit disability insurance and a "perma-plate" chemical treatment for the car at an additional cost of over $3,800. The total cost for the car including taxes and other fees and all the questionable add-ons came to almost $23,000. Joshua gave the dealer $9,500 down, and agreed to finance the balance of the purchase price over five years at 21% per cent interest with monthly payments of $364. Joshua seemed oblivious to the fact that he had agreed to make monthly payments on the car contract even though he had no job, nor any annuity payments available to him for the next ten years.

Instead, and even though he realized it would upset them, Wiggins drove his prize to his parents' house. When they saw the new car, they tried to question Wiggins about it, having no idea where he could have acquired the money to make such a purchase. After a brief argument, Joshua sped off and over the next two months did not return home. Instead, he got into trouble with the law, experimented with drugs, and gave a substantial amount of his recently-found cash to a seamy "friend" to open some kind of business, who promptly absconded with the money.

Wiggins' irresponsible behavior during this time was of course unfortunate, but to the Court, not surprising. Wiggins' contract with Defendant, his horrendous car deal, his abhorrent conduct, and his poor choice of friends evidences his general lack of concern for the course of his life during this time. To the Court, these events provide ample evidence of Wiggins' lack of

ability at the time to make rational, informed, constructive decisions due to his deficits in executive functioning skills. For example, when Wiggins finally ran out of money, he was arrested in September 1998. It seems he had actually summoned police to his motel room to investigate someone tampering with his car one night. This was hardly an exercise of good judgment, since when the police arrived, they discovered a small quantity of drugs on his person, which he had forgotten he was carrying. His life in shambles, he contacted his parents, who were able to persuade Joshua to return home.

In the meantime, Safeco had been notified of Wiggins' assignment of his annuity payments to Defendant. Safeco advised Defendant it would refuse to honor the requested change of address for transmission of payments to Defendant's address. This was a problem for Defendant. But Defendant's staff responded with a plan. With his supervisors' knowledge and at their instruction, Hodges attempted to initiate what Defendant referred to internally as an "automated clearinghouse" procedure ("ACH") concerning Wiggins' payments. This process required Wiggins to authorize Defendant to debit the savings account into which the annuity payments were deposited each month. In this fashion, Defendant could bypass Safeco's refusal to pay Defendant directly.

There was an obvious impediment to this maneuver. Wiggins' savings account was a joint account with his mother. Knowing that obtaining Eva Hale's cooperation in the scheme would be impossible, Hodges attempted another tactic. Instead of using the savings account for the ACH procedure, Hodges contacted Wiggins and instructed him to open a new bank account solely in his name, which Defendant could then debit monthly. Wanting to cooperate, Joshua complied with Hodges' directive. As it turned out, though, Hodges' ingenuity was foiled. When Wiggins went to open the new account, a friendly employee in the small-town bank contacted Eva Hale and informed her of what was transpiring. Wisely, Mrs. Hale directed the bank to place her name on the new account, also. Defendant was thwarted.

## F. The Lawyers Get Involved.

After Wiggins returned home, and since he had no money to make payments, his car was repossessed and sold, and he became responsible for a $3,519.36 deficiency on the contract. Defendant's Exhibit 105, pp. 1–2. In December, the Hales contacted Plaintiffs' counsel regarding Joshua's predicament. At that time, neither they nor Wiggins were precisely sure what had occurred between Joshua and Defendant, since Wiggins has almost no memory of his dealings with Defendant's agents. The attorneys needed information.

On December 28, 1998, Plaintiffs' counsel sent a letter to Defendant requesting information about the transaction between Defendant and Wiggins. In the letter to Defendant, Wiggins' attorney indicated that Joshua's settlement had resulted from a "serious motor vehicle collision in which Joshua sustained severe and permanent head injuries." Defendant's Exhibit 110. Additionally, counsel stated in the letter, "[a]pparently in 1998 some type of assignment and/or purchase of the annuity contract was made by Mr. Wiggins, although the details of what was done is not clear either to Joshua or his parents." Id.

Defendant's reaction to this letter strikes the Court as absolutely astonishing. Defendant's general counsel, Craig Lessner, responded by sending Wiggins' lawyers the requested information during the first week of February 1999. Then, less than two weeks later, on February 15, and without further communicating with

Plaintiffs' counsel, Lessner authorized a lawyer in New Jersey to file suit against Wiggins. Lessner explained to the Court that he decided Defendant should sue Wiggins because the lump sum annuity payment of $3,600 which had been assigned by Wiggins to Defendant and was due on January 5, 1999, had not been sent by Safeco to Defendant, and because the ACH procedure had been ineffective. In light of these facts, Lessner presumably concluded Wiggins was out to cheat Defendant.

Suit was filed against Wiggins in the New Jersey state courts on February 19, 1999. In spite of the information in Defendant's possession at that time which indisputably suggests there may be problems with Joshua's mental capacity to contract, and without inquiring further, the complaint filed against Joshua Wiggins accused him of knowingly converting Defendant's property and sought an award of punitive damages against him.

Of course, New Jersey is neither Defendant's primary place of business, Wiggins' domicile, nor the location where Joshua Wiggins entered into the transaction with Defendant. Lessner defends his company's choice to sue Joshua in a foreign forum by pointing out that Defendant had an existing relationship with a New Jersey law firm,[5] and therefore it was supposedly convenient for Defendant to litigate with Wiggins there. A more plausible explanation for Defendant's decision is that New Jersey is a convenient forum for Defendant's lawyers, not for its own officers, nor of course, for its customers. Defendant's legal chief also pointed out to the Court that one of the hundreds of legally binding provisions in the contracts and other documents signed by Wiggins in connection with Defendant's purchase of his annuity payments was a clause whereby Joshua allegedly knowingly and voluntarily consented to suit exclusively in New Jersey, with New York law to control the outcome of any such legal dispute. Plaintiffs' Exhibit 1, p. 0000135, 0000138.[6]

Lessner was reminded during his testimony that Wiggins had cooperated with Defendant's attempts to secure payment from Safeco, and that therefore Defendant arguably lacked any basis for the allegation that Wiggins had sought to intentionally damage Defendant. In response, the witness could only feign a justification for requesting punitive damages. He argued the fact that Defendant had not received the annuity payments was, in itself, circumstantial evidence that Wiggins had intentionally diverted them. Plaintiffs' Exhibit 18b, p. 7.

## G. Wiggins Files for Bankruptcy and This Litigation Begins.

By now, Wiggins' situation seemed bleak. He was faced with the continuing challenges presented by his brain injuries; he had substantial debt and creditors were demanding payment; he had purportedly "sold" the next ten years of his annuity payments for a fraction of their face value; and he was being sued in New Jersey. With his parents' help, Wiggins filed for relief under Chapter 13 of the Bankruptcy Code on March 26, 1999. On June 28, 1999, with the concurrence of Joshua's doctor, his parents were appointed by the state courts to serve as his guardians and as conservators of his financial affairs.

---

**5.** Several of the lawyers who serve as officers for Defendant apparently graduated together from Rutgers Law School in New Jersey.

**6.** Of course, if Wiggins was incapable of contracting with Defendant, which was likely the ultimate issue in any litigation, his agreement to litigate in New Jersey was also unenforceable.

In connection with the Chapter 13 case, on September 13, 1999, the Hales, joined by the Chapter 13 Trustee, commenced this adversary proceeding. Plaintiffs allege Defendant is guilty of violations of the Idaho Consumer Protection Act; breach of fiduciary duty; fraud; breach of the implied covenant of good faith and fair dealing; intentional interference with contractual relations; and intentional infliction of emotional distress.[7] They seek a determination from the Court that the Purchase Agreement executed by Wiggins in favor of Defendant is void and unenforceable, and that based upon its conduct in the transaction, Defendant should not be entitled to restitution of the purchase price it paid Wiggins. Plaintiffs also seek an award of compensatory and punitive damages, and attorneys fees and costs.[8] Any recovery in this action is pledged, after payment of legal expenses, to satisfaction of Wiggins' debts under his confirmed Chapter 13 plan.

Defendant adamantly denies it is guilty of any wrongdoing or sharp dealing. Instead, it defends its contract with Wiggins as a reasonable one in the context of the marketplace, and insists the transaction was supported by Wiggins' consent freely given. If Wiggins did suffer from mental deficiencies, Defendant's agents deny any knowledge of such as events unfolded. In other words, Defendant views its dealings with Wiggins as merely business.

Assuming Defendant's spin is a fair one, though, something odd occurred on the eve of trial. Suggesting that because it now had the information it needed to make such a decision, Defendant filed a pleading with the Court wherein for the first time Defendant conceded the Purchase Agreement should be rescinded.[9] Defendant also agreed to waive its right to seek restitution of any amounts paid to Wiggins. According to Defendant, its concession should not be interpreted as an admission of any misconduct in the transaction. However, Defendant suggests its gesture

**7.** Defendant argued that Plaintiff should not be able to assert claims under the ICPA or for breach of fiduciary duty because those claims were not adequately pled in Plaintiff's complaint. *See* Motion by Defendant Peachtree Settlement Funding to Exclude Unpleaded Claims From Trial (Docket No. 153) and Plaintiff's Brief in Opposition to this motion (Docket No. 156). At trial, the Court denied Defendants request to exclude such claims, concluding that Defendant had been given fair notice of Plaintiff's intent to pursue these theories.

**8.** Plaintiffs' complaint had also sought to void the Purchase Agreement and deny restitution to Defendant because the agreement allegedly violated the anti-assignment provisions of the settlement agreement and annuity contract, and otherwise applicable law. This argument highlights what is currently a hotly contested issue of law. *See, e.g., Piasecki v. Liberty Life Assurance Co. Of Boston,* 312 Ill.App.3d 872, 245 Ill.Dec. 340, 728 N.E.2d 71 (2000) (holding anti-assignment provision precludes assignment of structured settlement payments);

*Grieve v. General American Life Ins. Co.,* 58 F.Supp.2d 319 (D.Vt.1999) (holding anti-assignment clause in structured settlement is enforceable); *contra Rumbin v. Utica Mut. Ins. Co.,* 254 Conn. 259, 757 A.2d 526 (2000); *In re Terry,* 245 B.R. 422 (Bankr.N.D.Ga. 2000). The Court need not attempt to resolve the issue here, however, because Defendant has agreed to rescission of the Purchase Agreement and has waived the right to pursue restitution, as is discussed below.

**9.** This notable pleading is entitled "Defendant's Response to Plaintiff's Motion for Entry of Judgment" (Docket No. 157) and was filed on May 9, 2001, the day before trial commenced. Plaintiff had asked the Court to enter judgment as a matter of law on its rescission claim based upon concessions made by Defendant in its trial brief. *See* Defendant's Trial Brief (Docket No. 149) p. 19; Plaintiff's Motion for Entry of Judgment (Docket No. 155). In response, Defendant effectively agreed to rescission of the purchase contract and waiver of any right to recover any payment made to Wiggins.

should signal a conclusion to this unfortunate transaction, and of course, this litigation.

For the reasons set forth below, the Court respectfully disagrees with Defendant.

### III. Discussion and Disposition of the Issues.

#### A. Idaho Consumer Protection Act.

■ Plaintiffs claim Defendant violated the Idaho Consumer Protection Act ("ICPA"), Idaho Code § 48–601 *et seq.*, in its dealing with Wiggins. Idaho Code Section 48–608 provides in relevant part:

> (1) Any person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by this act, may treat any agreement incident thereto as voidable or, in the alternative, may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is the greater; .... Any such person or class may also seek restitution, an order enjoining the use or employment of methods, acts or practices declared unlawful under this chapter and any other appropriate relief which the court in its discretion may deem just and necessary. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper in cases of repeated or flagrant violations.

Idaho Code § 48–608(1). The ICPA was adopted by the Legislature in 1971, and like others on the books in most states and its Federal counterpart, the purpose of the Act is "to protect both consumers and businesses against unfair methods of competition and unfair and deceptive practices

in the conduct of trade or commerce, and to provide efficient and economical procedures to secure such protection." Idaho Code § 48–601. The ICPA is a remedial statute, *id.*, and is to be construed liberally in order " 'to deter deceptive or unfair trade practices and to provide relief for consumers exposed to proscribed practices.' " *In re Western Acceptance Corp., Inc.*, 117 Idaho 399, 788 P.2d 214, 216 (1990), citing *State ex rel. Kidwell v. Master Distribs., Inc.*, 101 Idaho 447, 615 P.2d 116, 124 (1980).

#### 1. Purchase or Lease of Goods or Services.

As a threshold matter, Defendant argues it is not subject to the provisions of the ICPA as it was not engaged in the sale or lease of goods or services. Specifically, Defendant asserts that it was a purchaser of Wiggins' right to receive the annuity payments, and that the annuitant (*i.e.*, Wiggins) was the seller. Following the instruction of the case law cited above, and in light of the evidence and testimony, the Court rejects this narrow characterization of Defendant's activities.

"Goods" are defined broadly under the ICPA to include any tangible or intangible personal property or "thing of value." Idaho Code § 48–602(6). "Services" are defined in a similarly expansive fashion to encompass any "work, labor or *any other act or practice* performed by a seller to or on behalf of a consumer." Idaho Code § 48–602(7) (emphasis added).

■ Guided by these broad notions, the facts do not support Defendant's contention. Defendant proudly offered to provide its goods and services to Wiggins and others in Idaho via a national cable television advertising campaign. When Wiggins inquired in response to the ad, Defendant's agent, John Hodges, made specific oral and written offers to provide Joshua cash

and other "financial services" in connection with this transaction. For example, Defendant sent Wiggins brochures and written promotional materials. At one place in this literature, Defendant proclaims the virtues of its "Settlement Re–Financing System" which it described as a "unique system [that] allows Peachtree Settlement Funding to provide the highest possible level of *service* . . . ." Plaintiff's Exhibit 12, p. 3 (emphasis added). It also touts its "Financial Needs Assessment and Planning Program," its "Flexible Financing Program," and its "Assured Transaction Funding Program." [10] *Id.* In light of these representations, Defendant can hardly deny it was offering its clients financial advice, or in other words, peddling "services" as contemplated by the ICPA.

Taking a real-life view of Defendant's activities, even apart from its own promotional descriptions, the Court concludes Defendant was in effect engaged in "selling money." At one point, Defendant concedes as much when in its sales manual it explains to its account executives that Defendant is in the business of offering its clients "innovative financial products." Plaintiffs' Exhibit 3, p. 4. It offered to exchange cash in the form of a lump sum payment to its clients in return for the assignment of the clients' right to receive annuity payments due over time. *See* Idaho Code § 48–602(6); *Idaho First Nat. Bank v. Wells,* 100 Idaho 256, 596 P.2d 429, 432 (1979) (construing the definition under the Act of "goods" to include intangible property). When the facts are seen in this fashion, Defendant is simply a modern day moneychanger. It traded cash for contract rights, and in the process, offered its "clients" financial advice (*i.e.,* a "service") in achieving their particular financial goals. As explained in the regulations adopted by the State of Idaho under the ICPA, Joshua Wiggins was a consumer in responding to Defendant's offers. *See* IDAPA 04.02.01.020.13 ("consumer" defined as "[a] person who purchases, leases, or rents, or is solicited to purchase, lease, rent or otherwise give consideration for any goods or services").

Given the remedial goals of the ICPA, regardless of how Defendant's business activities are characterized, the Court is confident the Legislature intended that Defendant's offer of money and advice to Idaho residents placed it squarely within the purview of the ICPA.

## 2. Ascertainable Loss.

Even if conduct constituting a violation of the ICPA is identified, there will be no right to recover under the statute unless the consumer sustains an "ascertainable loss" of money or property. Idaho Code § 48–608(1); *Yellowpine Water User's Association v. Imel,* 105 Idaho 349, 670 P.2d 54, 56–57 (1983); *Shurtliff v. Northwest Pools, Inc.,* 120 Idaho 263, 815 P.2d 461, 464 (App.1991). "Ascertainable loss" is defined under the Idaho Rules of Consumer Protection to include the following: "[a]ny deprivation, detriment, or injury, or any decrease in amount, magnitude, or degree that is capable of being discovered, observed, or established." IDAPA 04.02.01.020.05. Other courts have described it in the same manner. *See, e.g., Feitler v. Animation Celection, Inc.,* 170 Or.App. 702, 13 P.3d 1044, 1050 (2000) (describing "ascertainable loss" as "amorphous;" "[a]ny loss will satisfy that requirement so long as it is 'capable of being

---

**10.** Defendant referred to these offered services as "trademarked programs," although nothing in the record shows Defendant had actually registered any trademarks concerning these financial accommodations. Plaintiffs' Exhibit 12, p. 2; Plaintiffs' Exhibit 5, Bates No. 0000491, ¶ 5.

discovered, observed, or established' " (citation omitted)); *Criscuolo v. Shaheen,* 46 Conn.Supp. 53, 736 A.2d 947, 953 (1999) (same). Another court has described it as any "real, tangible out-of-pocket expense." *Lennon v. Wyeth–Ayerst Laboratories, Inc.,* 2001 WL 755944, *3 (Pa.Super., 2001).

Defendant contends Plaintiffs suffered no ascertainable loss in this case. It reasons that since it paid Wiggins over $17,000, has agreed to rescission of the parties' contract, and has waived any alleged right to restitution, Plaintiffs have not suffered financially.

To show a loss contemplated by the statute, Plaintiffs point to the attorneys fees and costs incurred in connection with this transaction and in Wiggins' bankruptcy case, the attorneys fees and costs incurred in securing the appointment of the Hales as Wiggins' conservators and guardians, and the expenses incurred in securing a medical examination to determine Wiggins' competency. Plaintiffs also cite Wiggins' lack of access to his annuity payments for the past two years during the pendency of this adversary proceeding, because the annuity payments were being held by the Chapter 13 Trustee pending a determination of the parties' rights to the payments.

■ Again, Defendant takes a far too restricted view of the meaning of the statutory language. The Court concludes the Hales and Wiggins have been put to substantial cost and expense in order to unravel Wiggins' contract with Defendant. While Defendant is obviously out the money originally paid Wiggins to seal their deal, but for the bankruptcy filing and prosecution of this litigation, the Court doubts the Hales and Wiggins could have secured the relief finally offered by Defendant on the courthouse steps.

Defendant disclaims responsibility for any consequences of Wiggins' apparent bad judgment in agreeing to sell Defendant his annuity payments. Moreover, it is true Joshua received a $17,000 payment as a result of his compact with Defendant. However, in retrospect, Wiggins' deal with Defendant was an expensive bargain for he and his parents indeed. Defendant's help in frustrating the protections of the structured settlement, combined with Wiggins' mental impairment, yielded Wiggins' spending binge and subsequent bankruptcy, not to mention the other serious social and psychological costs that flowed from Joshua's unfortunate experience with Defendant. In addition, until Defendant agreed to rescission of the contract, Plaintiffs' access to Wiggins' annuity payments was denied.

Because attorney fees are separately recoverable under the ICPA, Idaho Code § 48–608(4), Plaintiffs' attorney fees incurred in connection with this adversary proceeding should not be considered an "ascertainable loss." *Hedrick v. Spear,* 138 Or.App. 53, 907 P.2d 1123, 1125 (1995). However, Plaintiffs' attorney fees incurred in connection with Joshua's bankruptcy filing and conservatorship proceeding, doctor fees incurred to determine his competence, and Wiggins' loss of access to his annuity payments, and his loss on the car transaction, are all tangible out-of-pocket expenses which are capable of being discovered, observed, or established, and constitute ascertainable losses for purposes of the ICPA. *See, e.g., Simms v. Candela,* 45 Conn.Supp. 267, 711 A.2d 778, 781 (1998) (holding that medical expenses were within meaning of ascertainable loss under that state's consumer protection statute). While the precise amount of the losses Plaintiffs suffered as a result of the transaction with Defendant was not demonstrated at trial, on this record the Court is persuaded and therefore finds those losses

exceeded any benefits Wiggins may have received from the payment made to him by Defendant.

### 3. Practice Deemed Unlawful by the ICPA.

#### a. Trade Or Commerce.

Idaho Code Section 48–603 forbids a variety of unfair or deceptive acts or practices occurring in the conduct of any trade or commerce in this State. "Trade" and "commerce" are in turn defined as "the advertising, offering for sale, selling, leasing, renting, collecting debts arising out of the sale or lease of goods or services or distributing goods or services, either to or from locations within the state of Idaho, or directly or indirectly affecting the people of this state." Idaho Code § 48–602(2). Was Defendant engaged in trade or commerce in this case? The answer to this question is clearly "yes."

■ When Defendant attempted to purchase Wiggins' annuity payments for profit, it engaged in conduct qualifying as trade or commerce under the ICPA. Defendant advertised its product through use of television commercials which were broadcast to viewers in Idaho. Furthermore, Defendant sent written promotional literature, contracts, forms and other materials to Wiggins in Idaho. Defendant thereby offered its allegedly "trademarked services" and sold its "product" (*i.e.*, financing) in this State. Wiggins signed all contracts and forms in Idaho. Finally, when Defendant sued Wiggins in New Jersey for diverting the annuity payments, and served him with process in Idaho, it was engaged in the collection of a debt in Idaho. All of these actions place Defendant within the definition of "trade" or "commerce," as provided under Idaho Code § 48–602(2).

#### b. Obtaining Signature on Blank Notarized Document.

The Court next turns to the question of whether Defendant committed an unfair or deceptive trade practice in its transactions with Wiggins. The Court concludes Defendant crossed the line imposed by the statutes in many regards. The list of offensive practices that follows is not necessarily exclusive.

■ For example, the statutory list of forbidden actions or practices encompasses any situation "where a person [obtains] the signature of the buyer to a contract when it contains blank spaces to be filled in after it has been signed . . . ." Idaho Code § 48–603(12).[11] In this case, Defendant's agents readily admitted at trial that they intentionally obtained Wiggins' signature on two notarized documents containing blank spaces. Plaintiffs' Exhibits 22d, 22e. These documents were included as an exhibit to the Purchase Agreement Wiggins was required to sign. The blank spaces were designed to allow Defendant to later conveniently and unilaterally change the address to which Safeco would be instructed to mail Wiggins' annuity payments. Plaintiffs' Exhibits 22d and 22e.

Interestingly, Hodges testified via videotape that, based upon his training, he was informed it was "illegal" for him to ask a client to sign a notarized form containing blank spaces to be filled in by Defendant's

---

11. Once again, for the reasons expressed above, the Court is comfortable regarding Wiggins as the buyer, not the seller, in his transaction with Defendant. Here, just as described in Defendant's advertising, Joshua was purchasing a financial service or accommodation from Defendant. To the extent it would insulate this transaction from scrutiny under the consumer protection laws, Defendant should be estopped from characterizing the transaction differently now.

agents at a later date. He understood such practice would contravene Defendant's internal policies, and that any employee who was discovered to have committed such an act would be fired.

Unfortunately, Hodges' testimony is at odds with that of one of Defendant's primary policy-makers, Chief Executive Officer, James Terlizzi. Terlizzi acknowledged he was aware that Defendant engaged in this practice and explained the blank spaces in the documents were included so that, if necessary, it could change its "lockbox address" where it collected payments; it could redirect payments if it assigned the payments to another party; or so that Defendant could redirect the payments back to the annuitant after the period of assigned payments had expired. In short, Terlizzi, a lawyer by training, perceived no problem in obtaining Wiggins' signature on a notarized document in which portions of that document were left blank, and in later filling in the relevant information. This approach was justified, in Terlizzi's view, because the only property impacted (*i.e.*, the assigned payments) was that which Defendant already "owned."

Despite Defendant's CEO's comfort in obtaining sworn documents with blank spaces to be completed by Defendant's agents at a later time, in the Court's opinion, the practice runs afoul of the intent of the Idaho Legislature since it has expressly prohibited such a practice as a matter of Idaho business policy.[12] Defendant violated the ICPA in this regard.

### c. Unconscionable Methods, Acts, or Practices.

A compelling case is made by Plaintiffs that Defendant violated the ICPA in other ways. This aspect of Plaintiffs' case, which the Court concludes has merit, focuses upon the generally egregious and offensive manner in which Defendant and its agents approached its dealings with Wiggins. Idaho Code § 48–603(18) forbids a company from "[e]ngaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48–603C, Idaho Code ..." In determining whether a practice is "unconscionable," Idaho Code § 48–603C requires the Court to consider the following circumstances:

(a) Whether the alleged violator knowingly or with reason to know, took advantage of a consumer reasonably unable to protect his interest because of physical infirmity, ignorance, illiteracy, inability to understand the language of the agreement or similar factor;

(b) Whether, at the time the consumer transaction was entered into, the alleged violator knew or had reason to know that the price grossly exceeded the price at which similar goods or services were readily available in similar transactions by similar persons, although price alone is insufficient to prove an unconscionable method, act, or practice;

(c) Whether the alleged violator knowingly or with reason to know, induced

---

**12.** Defendant's reason for employing the practice of obtaining documents signed "in blank" may seem a reasonable solution to a practical problem. However, it is not the role of the Court to decide whether the Legislature's policy prohibiting such a practice is a wise one, or whether it may unduly burden modern commerce. The law simply prohibits the practice. On the other hand, it is not difficult to envision the potential for mischief involved in allowing a party to make additions to sworn business contracts after signature. Idaho's lawmakers evidently determined the prohibition of such practice justified, and that is enough reason for the Court to apply the statute as written here.

the consumer to enter into a transaction that was excessively one-sided in favor of the alleged violator;

(d) Whether the sales conduct or pattern of sales conduct would outrage or offend the public conscience, as determined by the court.

Idaho Code § 48–603C(2). Also relevant here is the provision of the statute specifying that "[a]ny unconscionable method, act or practice in the conduct of any trade or commerce violates the provisions of this chapter whether it occurs before, during, or after the conduct of the trade or commerce." Idaho Code § 48–603C(1).

Determining whether Defendant employed unconscionable practices implicates primarily a factual analysis. The parties each relied heavily upon testimonial evidence at trial. Again, the Court found the opportunity to observe the witnesses especially important in this case in weighing the credibility and determining the weight to be assigned to that testimony. After a careful review of the record, and based upon the Court's judgments concerning credibility, the Court finds the facts to be more in line with those suggested by Plaintiffs than Defendant.

### i. Wiggins Was Not Reasonably Able to Protect His Interests.

◼ At trial, Plaintiffs and Defendant each presented expert testimony regarding Wiggins' mental capacity, impairments, and general competency. Plaintiffs elicited testimony from Mark D. Corgiat, Ph.D. Dr. Corgiat is a practicing neuropsychologist who has known Wiggins and treated him on an outpatient basis since the automobile accident in 1994. He is currently the director of psychological services at Pocatello Regional Medical Center, Bannock Regional Medical Center, and Psychological Assessment Specialists. He has extensive experience with traumatic brain injury patients. In sum, the Court was impressed with Dr. Corgiat's intimate and extensive knowledge of and experience with Joshua Wiggins and his particular circumstances, and his general knowledge of this form of brain damage.

Dr. Corgiat testified that as a result of the automobile accident, Wiggins suffered a permanent and irreversible injury to the frontal lobe of his brain. The injured portion of Joshua's brain is that which controls "executive functioning." It is Dr. Corgiat's opinion that Wiggins' brain injury has significantly impacted his ability to solve problems, to reason, to exercise judgment, and to organize and plan. On the other hand, Dr. Corgiat explained that such an injury to the frontal lobe does not necessarily affect a person's intelligence. In fact, Joshua has an average intelligence quotient. Rather, the witness explained, Wiggins' injury impacted his ability to utilize and apply his intelligence.

In particular, Dr. Corgiat offered his professional opinion that while Wiggins could intellectually understand the various factors involved in deciding whether to contract with Defendant, because of Joshua's brain damage, he could not analyze the information he learned about the annuity deal, nor apply his knowledge to make a reasoned decision about the transaction. In particular, Dr. Corgiat described Wiggins' behavior as a result of his injury as "stimulus bound." In this respect, the Court understood the doctor to mean that Joshua Wiggins is easily manipulated in his decision-making, especially when he desires a certain result. In particular, Dr. Corgiat opined that Wiggins could not be expected to weigh the prospects for immediate gratification of his perceived needs (*i.e.*, having a new car and gaining "independence" from his parents' supervision) against any long-term potentially adverse consequences of his decision (*i.e.*, loss of a

secure, stable source of income). When offered a solution to his immediate needs, in this case by John Hodges, Joshua was simply not mentally equipped to adequately judge whether the solution was consistent with his interests. Instead, Wiggins was susceptible to Hodges' pitch.

Apparently, it is sometimes a challenge to distinguish a fully-functioning individual who makes an informed, but nonetheless "bad" decision, from someone with a frontal lobe injury and impaired executive functioning skills like Wiggins. The experts agree executive functioning skills or deficits are very difficult to objectively test. In this case, Wiggins scores in the average to above average range on intelligence tests and in the average range for executive functioning.

However, Dr. Corgiat concludes Joshua's ability to exercise executive function in the "real world" is substantially impaired. It was evidently because of the equivocal test results that Dr. Corgiat could not make a confident determination concerning Joshua's competence until he was reevaluated in April 1999. Dr. Corgiat apparently concurred in the Hales' decision that Wiggins be allowed to drive a car and that he be allowed to attempt a college education. As time went by, Dr. Corgiat not only had the benefit of Wiggins' test scores, but also benefitted from "real world" accounts of how Wiggins was functioning academically, financially, and legally. Due to Wiggins' failures in all of these areas, particularly financially, Dr. Corgiat decided Joshua's executive functioning deficits had become apparent. Based in part upon this evidence, the historical reports regarding Wiggins' actions and behavior regarding his finances, schooling, criminal activities, and rebelliousness, as well as Dr. Corgiat's own clinical observations, Dr. Corgiat opined that Wiggins was incompetent and should be under the guardianship and conservatorship of his parents. While Dr. Corgiat does not believe Wiggins needs a guardian for all his activities, the doctor feels he does need protection concerning his financial decisions. Dr. Corgiat also believes that Wiggins was no doubt susceptible to manipulation and influence in his dealings with Defendant's agent, Hodges.

Defendant's expert, Erin Bigler, Ph.D. is also an experienced neuropsychologist. He is a professor of psychology and neuroscience at Brigham Young University and is the department chair of the psychology department. He also performs research at the University of Utah in the department of radiology, and maintains a private practice at LDS Hospital, specializing in, among other things, traumatic brain injury. Dr. Bigler is obviously a knowledgeable, respected health professional.

Dr. Bigler's contact with Wiggins consisted of approximately three hours of clinical observation and testing. Dr. Bigler also reviewed the medical records from Pocatello Regional Medical Center and Dr. Corgiat's records prior to examining Wiggins. His assigned purpose in seeing Joshua was to assess Wiggins' competency for purposes of this litigation only.

Based upon his brief examination of Joshua and of the medical records, Dr. Bigler agreed with Dr. Corgiat that Wiggins' head injury was a very serious one, and that the injury to his frontal lobe is permanent and irreversible. Dr. Bigler agreed that Joshua experiences problems with executive functioning stemming from that frontal lobe injury. Dr. Bigler also acknowledged that neuropsychologists have not yet developed totally adequate methods for testing executive functioning skills with a high degree of accuracy. Clinical observation, real world accounts, and the patient's personal history often provide a more accurate picture of the

extent of a patient's executive functioning skills than do clinical test results.

Based upon this information, Dr. Bigler seemed to agree that Wiggins can be easily manipulated when he desires a certain result. Dr. Bigler went on to testify that Wiggins' "bad decision" to enter into the transaction with Defendant was likely related to his frontal lobe injury.

Both Dr. Corgiat and Dr. Bigler concurred that it is unusual for a traumatic brain injury patient to have a guardian. Ordinarily, family members will step in and provide the necessary assistance, rendering guardianship or conservatorship unnecessary. Additionally, they agreed that Wiggins does not have many outward manifestations of his executive functioning deficits, and a person not familiar with Wiggins' history might not be aware of the problem.

While their opinions were largely consistent in most respects, the experts disagreed in their final conclusions. Dr. Corgiat holds the opinion that Wiggins is (and was) legally incompetent, and so testified when Mr. and Mrs. Hale sought guardianship and conservatorship over Wiggins and his financial affairs. In Dr. Bigler's opinion, Wiggins is not incompetent. Dr. Bigler believes that while Wiggins is impulsive and may be subject to manipulation, his problems do not meet the standard for legal incompetence.

While the Court appreciated hearing from two qualified experts, for purposes of deciding the issues in this action, the testimony regarding Wiggins' competence is largely equivocal. Importantly, neither expert could render an opinion concerning Wiggins' mental status in the summer of 1998 when Wiggins entered into the transaction with Defendant. Moreover, the relevant standard for application of the ICPA is not legal incompetence. Rather, the statute directs the courts to assess wheth-

er, in connection with a transaction, an actor knew or had reason to know the other party was "reasonably unable to protect his interests because of physical infirmity, ignorance, illiteracy, inability to understand the language of the agreement or similar factor." Idaho Code § 48–603C(2)(a). To the Court, this seems a lesser measure, not requiring legal incompetence. Dr. Corgiat testified that he believes Wiggins is, and was in summer of 1998, reasonably unable to protect himself due to his deficits in executive functioning. Dr. Bigler does not believe that "reasonably unable to protect himself" is a cognitive standard, and had difficulty in applying the standard as found in the ICPA.

Based upon the testimony and evidence, the Court finds and concludes that Joshua Wiggins was "reasonably unable" to protect his financial interests at the time of the transaction with Defendant. Regardless of his legal competency or lack thereof, in the summer of 1998, Joshua was susceptible to manipulation, subject to stimulus-bound behavior, and lacked mental function to properly exercise judgment or to weigh the consequences of his contracts. Joshua's condition was based upon a physical infirmity, the injury to his brain. Based primarily upon Dr. Corgiat's testimony and findings, the Court concludes Joshua represented the type of individual the ICPA was intended to protect.

### ii. Defendant Knew of Wiggins' Inability to Protect His Interests.

█ Assuming Wiggins was legally vulnerable for purposes of the ICPA, the next question in the statutory inquiry focuses on whether Defendant knew or had reason to know of Wiggins' inability to protect his interests. The evidence on this point is, again, disputed. However, again, the Court finds for the Plaintiffs.

Eva Hale testified she informed John Hodges about Joshua's brain injury and mental deficits in a phone conversation on May 21, 2001. As noted, Hodges disputes this information was conveyed. As discussed below, the Court believes Mrs. Hale, not Hodges. It may be that Hodges failed to reveal his knowledge of these critical facts to his superiors. If so, such is a matter between Hodges and his superiors, and is of no consequence to the Court's decision. Defendant is charged with the knowledge obtained by its agent. *Kootenai Co. v. Western Casualty & Surety Co.,* 113 Idaho 908, 750 P.2d 87, 92 (1988) ("notice to the agent is imputed to the principal"), citing *State ex rel Kidwell v. Master Distribs., Inc.,* 101 Idaho 447, 615 P.2d 116 (1980); *Williams v. Continental Life and Accident Co.,* 100 Idaho 71, 593 P.2d 708, 709 (1979) (same); *see also E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.,* 1996 WL 111133, *2 (Del.Super.1996) ("[k]nowledge of an employee is imputed to the employer"); *Edington v. A & P Enterprises, Inc.,* 900 P.2d 453, 455 (Okla.App.1995) (same).

However, even apart from this important conversation, other information warning of Wiggins' predicament was also available to, and should have been heeded by, Defendant's employees. After Defendant's salesman made an acceptable purchase offer to Wiggins, Joshua returned the written "application" to Hodges. Defendant's legal department then took responsibility for conducting a "due diligence" review of the information supplied.[13] It is uncontroverted that, at this point in time in May, 1998, and prior to funding the transaction, Defendant's legal department had in its possession a docu-ment indicating Wiggins had suffered a head injury in December 1994. Plaintiffs' Exhibit 20. Defendant's legal auditors failed to inquire about the extent of Wiggins' injuries. Instead, as explained by Defendant's witnesses, Defendant's "due diligence" entailed reviewing the terms of the settlement and annuity contract, determining the settlement amount was not substantial, and noting Wiggins, rather than a guardian or conservator, had signed the documents. Based upon this perfunctory analysis of the information, Defendant's legal staff evidently concluded Wiggins was mentally sound. Plainly put, they erred.

Defendant's management attempts to justify the legal department's decision to ignore significant facts. When Defendant's CEO was questioned about why his staff was not alerted to potential problems with the proposed contract because of the extent of Wiggins' injuries, he testified that, in his opinion, the term "head injury" appearing in the data submitted by Wiggins was too vague and unspecific to raise concerns. The CEO opined that the notation in the materials could possibly refer to anything from, in his very words, a "minor boo-boo," to a traumatic brain injury. Defendant's legal team consisting of lawyers and paralegals apparently surmised that since the description of Wiggins' injuries was nondescript, no cause for further inquiry was presented. To the Court, this head-in-the-sand approach hardly constitutes due diligence.

In addition, Wiggins was required to complete a "Structured Settlement Questionnaire," in which he was required to place his initials certifying that he was not

---

**13.** A "Structured Settlement Checklist" was admitted in evidence, wherein a paralegal "checked off" the item indicating "Disability issues (if any) have been addressed." Plaintiffs' Exhibit No. 1, p. 1. There is no indica-tion in the record, however, concerning what steps Defendant's employees took to "address" Joshua's potentially disabling brain injury.

disabled or incapacitated. Plaintiffs' Exhibit 1, Bates No. 0000134. Defendant's management also points to these entries to justify their failure to inquire further. To the Court, this represents a curious, almost humorous, approach to detecting potential problems with an annuitant's mental capacity. The Court must surely wonder how a mentally deficient person could be expected to competently certify that he or she is not incapacitated. In addition, both Hodges and the legal department were aware that while Joshua Wiggins was twenty years old, he was unemployed and living at home with his parents. Plaintiffs' Exhibit 1, Bates No. 0000193; Plaintiffs' Exhibit 23. They also acknowledge that based upon company policies such facts are significant.

Defendant's legal department also had access to Hodges' phone log. The notes from May 21 indicate Hodges had spoken to Mrs. Hale, who was adamantly opposed to the transaction, had indicated their attorney had said the proposed contract was "illegal," and that Wiggins was not going to enter into the transaction. Why was Eva Hale so opposed to this deal? What did she mean when she challenged Hodges that the contract would be, in the opinion of legal counsel, "illegal?" Didn't the legal department see that in order to overcome these objections, Hodges simply began communicating with Wiggins at a different address and phone number?

To the Court, these facts alone are enough to charge Defendant's experienced staff with notice that Wiggins may have problems protecting his interests, or in understanding the terms of the Defendant's proposed contract (*i.e.,* "the book").

Again, though, the "clincher" in this case comes from the testimony of Mrs. Hale. She told Hodges that Wiggins had suffered a head injury when he was sixteen years old and, in her view, would always

function as a sixteen-year-old. Hodges adamantly denies Eva Hale told him anything regarding the head injury or the fact that Wiggins functions at a sixteen-year-old level. He testified that if Mrs. Hale had told him those things, he would have immediately informed Defendant's legal department. The Court finds his testimony to be incredible for several reasons.

Hodges repeatedly indicated during his testimony he perceived his job at Defendant was to "do the deal," and to "push the need." When asked what Mrs. Hale could have said to convince him not to conduct business with Wiggins, Hodges admitted that whatever Mrs. Hale had said to him about "the deal" would have been "irrelevant" to him. He also stated he was not concerned when Mrs. Hale indicated Wiggins' attorney had said the transaction was illegal; he simply assumed she was "making it up." Hodges acknowledged he did not document everything said in the conversations concerning this transaction in his phone log, nor does he document each and every conversation. This appears correct, since when compared to his testimony, Hodges' phone logs at times excluded any reference at all to some conversations, and important details from others. Plaintiffs' Exhibit 2.

Considering his demeanor and attitude, the Court finds Hodges was committed to "doing the deal" regardless of any information he received regarding Wiggins' ability to enter into the transaction. Especially in his video testimony, Hodges appeared aggressive, arrogant, and at times, immature. He was occasionally exceedingly anxious, fidgety, and nervous. When he thereafter appeared in Court to testify, Hodges was, in stark contrast, humble, contrite and even apologetic. This transformation in character appeared quite disingenuous to the Court, and along with

many other factors, causes the Court to discount his testimony.

Despite Mrs. Hale's mistaken belief that the crucial phone call was much longer than it apparently was, *see* Defendant's Exhibit 103, the Court finds that her testimony was far more credible than Hodges'. The Court believes that Mrs. Hale indeed told Hodges about the head injury and Wiggins' level of mental functioning, which Hodges, likely for his own pecuniary reasons, completely disregarded.

Additionally, both Hodges and Terlizzi testified about the company's policy instructing staff to avoid inquiring about the nature of a client's injuries. The purported reason offered by the witnesses for employing this "don't ask-don't tell" routine is that occasionally an annuitants' settlement has arisen from traumatic events such as molestation or wrongful death. In refraining from asking questions, Defendant's employees are therefore allegedly exercising sensitivity to such issues. The Court declines to find that Hodges' testimony should be believed because of his sensitivity about Joshua's privacy.

Despite having a document in the legal department's hands indicating Wiggins had suffered a head injury; despite knowing that the twenty-year-old Wiggins was unemployed and living at home with his parents; and despite having access to Hodges' phone log notes indicating Wiggins' mother had told him she was opposed to the transaction and had spoken to an attorney who said the transaction was illegal, Defendant chose to ask no further questions regarding the nature or severity of Wiggins' head injury. Most importantly, though, and even apart from the above facts, Eva Hale told Hodges about her son's mental abilities. Instead of assuming that Wiggins' injury was a "boo-boo," as Terlizzi suggested, Defendant's legal department had information in its possession requiring further inquiry and consciously chose to remain ignorant. Defendant both knew, and certainly had reason to know, that Wiggins was potentially unable to protect his own interests in this transaction and unable to understand his contract with Defendant. In other words, the Court concludes that Defendant's program of "due diligence" was not diligent at all.

Finally, Defendant admittedly received the letter from Plaintiffs' attorney dated December 28, 1998, months after the transaction was funded and closed, which indicated that Wiggins' settlement resulted from a "serious motor vehicle collision in which Joshua sustained severe and permanent head injuries." Defendant's Exhibit 110. Counsel also stated in the letter, "[a]pparently in 1998 some type of assignment and/or purchase of the annuity contract was made by Mr. Wiggins, although the details of what was done is not clear either to Joshua or his parents." Despite receipt of this letter and the implications its contents should impart to a veteran attorney like Lessner regarding Wiggins' competency, Defendant's general counsel instructed its lawyers to sue Wiggins in New Jersey for punitive damages for converting the annuity payments.

Initiating this litigation in a foreign forum against young Wiggins without advising his attorney of Defendant's intentions within days after receipt of a letter indicating that neither Joshua or his parents were certain as to the nature of the transaction he had entered into with Defendant was unjustified, Defendant's legal chief's excuses to the contrary notwithstanding. Why accuse Joshua of culpable conversion when he had thus far cooperated with Defendant's efforts to gain access to the annuity payments? Why not communicate further with this family's counsel, especially to inquire concerning the nature of Wig-

gins' injuries? Why not seek to resolve any differences amicably? Why sue in a New Jersey court selected not because of any contacts the parties may have with that State, but solely because it is convenient for Defendant's retained attorneys? Defendant's acts amounted to a thinly veiled attempt to intimidate Wiggins, Hales and their lawyers. This knowing decision by Defendant's management was not merely poor judgment, legally, in the sense used in the ICPA, it was unconscionable.

### iii. The Discount Rate Was Not "Grossly Excessive."

Plaintiffs assert that the initial offer made to Wiggins to purchase his annuity payments was actually more favorable than the final deal inked by Wiggins. In May, Hodges offered Wiggins $15,142 for the purchase of 116 of his monthly annuity payments. At some point, though, Wiggins apparently indicated to Hodges he needed more money. Hodges then offered him $17,699 for the 116 monthly annuity payments plus the $3,600 lump sum payment coming due in January 1999. Plaintiffs assert that the $2,557 increase represented by the second offer in consideration of the purchase of a $3,600 payment due in a few months amounts to a discount of more than 85%, and is therefore grossly excessive.

Defendant's executives testified that the maximum discount rate their company policy would allow to be offered to a potential client was 25%. They contend that calculating the discount rate in this transaction based solely on the $3,600 lump sum payment is unfair. They insist the proper focus is to consider all the assigned payments in assessing the discount rate. When this approach is employed, the overall discount rate for the second offer was 23.05%. Transaction Closing Form, Plaintiffs' Exhibit 21a.

■ The Court agrees that calculating the discount rate for any one payment would present a distorted view of the value of the transaction to either side. The testimony at trial was that the industry standard concerning purchase of personal injury settlement payments was a maximum 25% discount rate, whereas the overall rate offered to Wiggins was 23.05%.

Viewed in isolation, and assuming both sides to the transaction can bargain freely, the Court concludes employing a discount rate of 23.05% is not "grossly excessive" in and of itself and does not amount to an unconscionable method or practice on the part of Defendant under the ICPA. Again, though, this is not to say Hodges did not take advantage of Wiggins' willingness to deal in offering him a steeply discounted additional purchase price.

### iv. The Transaction Was "Excessively One–Sided."

With exhibits, the Purchase Agreement which Defendant required Joshua to sign was more than 75 pages in length, including the 25 or so exhibits and riders attached to the contract. Terlizzi testified that the length of the contract was a product of Defendant's apprehension over the legislative climate concerning such transactions, and the antagonism directed at annuity purchasers by the insurance industry. Terlizzi suggested that while the contract documents were lengthy, he did not believe they were too complicated for "ordinary folks" to understand.

■ The Court respects that reasonable people may disagree as to the level of legal sophistication possessed by "ordinary folks." However, in this instance, the Court differs with Defendant's chief executive's characterization of the complexity of this imposing document. The Court read the contract documents one afternoon. It

was a near exhausting mental exercise.[14] The documents are printed in small type and are extremely complex. For example, one paragraph, detailing Wiggins' many and varied obligations to indemnify Defendant, contains a single sentence that is nearly one-half page in length. Plaintiffs' Exhibit 1, p. 133–134. Joshua was required to make eighteen separate warranties, and eleven different covenants, in favor of Defendant. *Id.* at p. 129–133. There are no less than ten distinct conditions precedent to Defendant's obligation to pay Wiggins the purchase price. *Id.* at 133. And while the Court's count may be off a couple, Wiggins was required to sign the contract and exhibits in over 30 separate places!

The Court concludes Joshua Wiggins could not be expected to understand the provisions of the contract without help, even disregarding his particular mental challenges. Furthermore, Defendant's management appreciated the complexity of its contract. Defendant's own sales manuals used to instruct its account executives urges them to "demystify" the contract for claimants in order to get the documents signed and returned quickly. Plaintiffs' Exhibit 5, Bates No. 0000451.

Apart from sheer length and intricacy, the contract contains too many lop-sided provisions to list. For instance, the contract requires the annuitant to agree to forego suit against Defendant or its agents, attorneys, and employees for any reason including such things as breach of fiduciary duty, violation of any consumer regulations, intentional or negligent infliction of emotional distress, or deceptive trade practices.[15] The agreement requires the annuitant to waive jurisdiction and standing to sue Defendant for such claims. Plaintiffs' Exhibit 1, Purchase Agreement, p. 9, ¶¶ 7 a and b (Bates No. 0000134). The contract also requires the annuitant to agree that the laws of New York will govern the transaction, again without any apparent contacts with that State to justify such a provision, and that the forum for any enforcement action concerning the contract will be New Jersey (this offensive provision is discussed above), and that personal service of process will be waived. *Id.* at pp. 10, ¶ 13 (Bates No. 0000135); p. 13, ¶ 23 (Bates No. 0000138).

Furthermore, Exhibit S attached to the Purchase Agreement is a waiver of anti-garnishment laws of New Jersey, Georgia, and any other state which might otherwise be applicable. *Id.* at Exhibit S (Bates No. 0000190). Exhibit T requires the annuitant to certify he/she is of sound mind, that the annuity payments being assigned are not the annuitant's primary source of income, and that he or she is not suffering from any disability or incapacity which prevents gainful employment. *Id.* at Exhibit T, p. 4 (Bates No. 0000194). Again, how reliable is such a certification from someone lacking the legal capacity to contract?

One glaring omission from the Purchase Agreement is any disclosure to the annuitant of the applicable effective discount

---

**14.** To perhaps give perspective to the Court's comments, this bankruptcy judge represented a wide variety of lenders for over ten years as a lawyer, and in that role, drafted and analyzed commercial contracts of all sorts. On this Court, this judge has frequent occasion to review lengthy, complicated business agreements. While not the longest nor the most complex contract this judge has ever reviewed, it would probably rank on this judge's "top ten" list, taxing not only the reader's knowledge of contract law, but requiring considerable stamina, to complete.

**15.** The Court presumes it was a tactical decision on Defendant's part not to rely upon these "waivers" against suit in this case. The decision was justified.

rate based upon the amount of payments purchased compared to the purchase price. Terlizzi testified that during the time period in which Wiggins' transaction was made, Defendant's company policy was not to reveal the discount rate. While Defendant's management apparently did not think such a disclosure was appropriate in the summer of 1998, the CEO acknowledged that industry standards to which Defendant now voluntarily adheres require such a disclosure. National Association of Settlement Purchasers Code of Ethics, Plaintiffs' Exhibit 6, p. 3.[16]

The extremely complicated nature of the Purchase Agreement, in conjunction with the substantive waivers extracted from Wiggins, and the omission of crucial information from the documents, leads this Court to conclude that Defendant's contract with Joshua was "excessively one-sided" for purposes of the ICPA, and that Defendant was aware of such. This is another reason the Court concludes the transaction and Defendant's conduct was unconscionable.

### v. Defendant's Pattern of Conduct "Outraged or Offended the Public Conscience."

The ICPA condemns and prohibits any sales conduct likely to outrage or offend the public conscience. Idaho Code § 48–603(2)(d). Purchasing a mentally deficient young man's annuity payments after learning of his infirmity and behind the backs of his parents attempting to secure his future certainly must represent the type of conduct consumer protection laws were designed to discourage. Suing Wiggins in a distant court for punitive damages when the Defendant's scheme collapsed and after being contacted by his legal representative without any apparent factual or legal basis is similarly offensive conduct.

Did Defendant's agents and officers comprehend that their actions could injure Joshua and his family? The Court concludes they did, but that their profit motive was strong, and apparently overcame any concerns for Wiggins' welfare under these facts. In this regard, it is difficult for the Court to fairly describe in words the demeanor conveyed by Defendant's employees and executives on paper and during their testimony. Defendant's representatives seemed to regard Plaintiffs' situation and concerns with indignity. They apparently consider this action baseless and frivolous. Clearly, the testimony of Defendant's agents and executives conveys the impression they felt no significant harm had been done in this case. Their regard for Plaintiffs' interests was calloused and careless.

For example, as part of the company's pitch, Wiggins was offered a "financial needs assessment." While such is the promise made in the smooth promotional materials sent to "clients" by Defendant, in truth, according to Hodges, his help to Joshua in examining his financial requirements consisted solely of asking what Wiggins wanted to do with the money. In this case, even though Joshua was unemployed and living at home after suffering some sort of personal injury, and though his stated goals extended only so far as buying a car and getting an apartment, and that he would have to "screw his parents" and tell them to "shove it" in the process, Hodges' "financial needs assessment" concluded that these were appropriate goals. To the Court, this conclusion seems pathetic.

---

**16.** The same ethical code prohibits its members from any attempts to "take any unfair advantage of a prospective customer and [to] insure that the prospective customer is legally capable of entering into the transaction contemplated." Plaintiffs' Exhibit 6, p. 2.

Hodges apparently continued to think he had properly identified an appropriate financial strategy for Wiggins despite his conversation with the client's mother:

His parents are against this. The guy is 20 years old and wants to access some of his funds to get a place and a car and his parents are but heads [sic].

Computer Phone Log, Plaintiffs' Exhibit 2, p. 2. Hodges not only assumed Mrs. Hale was lying about Wiggins' attorney indicating the transaction was illegal, he disregarded her comments as "irrelevant." Moreover, as the Court found above, Eva Hale indeed told him about Wiggins' head injury and mental capacity, which Hodges then completely ignored.

Hodges' shady dealings with Wiggins continued. First, Hodges circumvented Wiggins' parents from further meddling in the transaction by sending documents and making calls to Wiggins at another address. Then later, when it was apparent that Safeco was not going to honor the assignment, Hodges instructed Wiggins to open a new account bearing only his name in order to effectuate the ACH procedure, and to circumvent any attempts by Joshua's parents to prevent Defendant from receiving the payments. Luckily, this effort proved unsuccessful.

Hodges' cavalier attitude and actions were compounded by Defendant's legal department, which disregarded information contained in a document it received prior to funding the transaction which indicated Wiggins had suffered a head injury. No "due diligence" was performed in this case—only a cursory review of the settlement agreement to determine how much it was and whether Wiggins had signed the original settlement papers. Defendant's legal team also bypassed their own policy of not transacting with unemployed persons by preparing an affidavit of employability for Wiggins to sign, indicating he had the ability to obtain a job earning in excess of $10,000 per year. Plaintiffs' Exhibit 23. While Joshua had in fact gotten jobs in the past, he of course had been unable to hold one due to his condition. The affidavit does not address this contingency. No attempt was made to ascertain Wiggins' educational level, or to review his actual employment history to verify that Wiggins truly had the ability to earn more than $10,000 per year.

While the actions of Defendant's account executive and legal department employees are disturbing, they are, the Court's understands, nonprofessionals motivated by their superiors to "do the deal." Such an excuse is not available to Defendant's senior management. In their testimony to the Court, the current CEO, senior vice-president of sales, senior vice-president of operations, and general counsel all agreed that while Hodges committed an indiscretion in recording inappropriate comments in his phone logs, that he, in their opinion, did nothing fundamentally wrong.[17] They also feel the legal department performed satisfactorily and followed company policies. Moreover, even though on the eve of trial Defendant "tossed in the towel" on any effort to enforce the contract or recover amounts paid to Wiggins, these executives all claim to be unaware of anything they or their subordinates should have done differently in Wiggins' case to have effected a more appropriate outcome. When challenged about this opinion, Terlizzi did indicate that management was "currently evaluating" whether any policies should be changed to prevent such a

---

**17.** When asked what discipline, if any, Hodges received as a result of his conduct in this case, Terlizzi indicated the account executive had been "spoken to" regarding his inappropriate phone log notes.

situation from occurring in the future, keeping in mind that the Wiggins transaction occurred about three years ago.

Even if management was correct in defending the account executive and legal department, which the Court concludes it was not, management cannot escape responsibility for the conduct occurring after the transaction was closed. Idaho Code § 48–603C(1) provides, "[a]ny unconscionable method, act or practice in the conduct of any trade or commerce violates the provisions of this chapter whether it occurs before, during, or after the conduct of the trade or commerce." The Idaho Supreme Court has held that activities conducted in connection with collection of a debt which arose from the sale of goods or services is subject to the provisions of the ICPA. *Western Acceptance*, 788 P.2d at 216.

Here, when it was determined that Safeco was not going to honor the assignment or address change and the ACH transaction was not effective, Defendant sued Wiggins in New Jersey. The suit was commenced despite the fact that Wiggins had been cooperative. Joshua did what Defendant required: he attempted to comply with Hodges' instructions to open a new account in which he was the only signatory so that Defendant could attempt the ACH procedure. It was Safeco, not Wiggins, who had refused to make payment to Defendant. The Purchase Agreement appears to specifically limit Wiggins' liability from such a refusal by the annuity issuer to honor the assignment:

> Notwithstanding anything to the contrary in the Agreement, so long as Seller, his successors, and assigns are not otherwise in breach of this Agreement or the Related Documents, Seller shall have no liability to Purchaser, its successors or assigns if any party other than Seller, his successors, assigns, heirs, executors, administrators and representa-

tives contests, challenges or fails to recognize the assignment effected hereby by reason of the existence of any provision in the Release purporting to prohibit or restrict assignment; Provided, however, that this provision shall not constitute a waiver of any of the conditions precedent to the performance by Purchaser of its obligations hereunder.

Terms Rider, Plaintiffs Exhibit 1, Bates No. 0000141. In other words, because Joshua had attempted to complete the transaction, Defendant was likely in breach of its own agreement when it sued Wiggins for actions for which he was supposedly immune from liability.

The lawsuit in New Jersey was also begun after receiving a letter from Wiggins' attorney requesting all information regarding the purchase of the annuity and which clearly indicated "that the structured settlement/annuity was established on behalf of Mr. Wiggins following a serious motor vehicle collision in which Joshua sustained severe and permanent head injuries." Defendant's Exhibit 110. Lessner then authorized litigation against Wiggins in New Jersey for diverting the annuity payments. Incredibly, the complaint filed against Wiggins recites that in allegedly breaching his promise to transfer his annuity payments to Defendant that: "[Wiggins'] actions were done knowingly, maliciously and with the intent to injure and defraud plaintiff and to deprive the plaintiff of its property and the benefit of its bargain ..." Defendant then prays for recovery of punitive damages from Joshua. Complaint, Plaintiffs' Exhibit 18b, p. 7.

When Lessner was asked what information Defendant had available at the time the suit was commenced suggesting that Wiggins knowingly and maliciously diverted the payments, and specifically what information was available which would support a prayer for punitive dam-

ages, Lessner indicated that it was his understanding that in New Jersey, including a claim for punitive damages in a complaint was routine, regardless of whether specific facts were known at the time of drafting the complaint which would support such an award. Presumably based on this understanding of New Jersey practice, Lessner admitted he authorizes punitive damages to be sought in *every* case brought on Defendant's behalf for alleged diversion of payments.

Lessner testified he is an attorney licensed to practice and a member of the Bar in New Jersey. As such, the Court assumes he must be aware of the New Jersey Rules of General Application, including Rule 1:4–8, which provides:

(a) Effect of Signing, Filing or Advocating a Paper. The signature of an attorney or pro se party constitutes a certificate that the signatory has read the pleading, written motion or other paper. By signing, filing or advocating a pleading, written motion, or other paper, an attorney or pro se party certifies that to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) the paper is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the factual allegations have evidentiary support or, as to specifically identified allegations, they are either likely to have evidentiary support or they will be withdrawn or corrected if reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support; . . . .

N.J. R. Gen. Application, Rule 1:4–8. Admittedly, local counsel, not Lessner, signed the complaint filed against Wiggins. However, according to his testimony, Lessner instructed Defendant's outside counsel to file a complaint against Wiggins and to include a claim for punitive damages with no information known at that time to support such a claim. Such would appear to be a direct violation of the New Jersey court rules.

Additionally, on January 5, 1999, Hodges attempted to contact Wiggins regarding the request for information sent by his attorney. Plaintiffs' Exhibit 2, p. 1. When questioned about this attempt at trial, Hodges testified he was instructed to make the phone call to Wiggins by Lessner. The Court also must think Lessner is aware of the requirements of the New Jersey Rules of Professional Conduct, which provide that:

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows, or by the exercise of reasonable diligence should know, to be represented by another lawyer in the matter . . . unless the lawyer has the consent of the other lawyer, or is authorized by law to do so, or unless the sole purpose of the communication is to ascertain whether the person is in fact represented.

N.J.R.P.C. 4.2. Again, arguably Lessner was not bound by the New Jersey Rules in connection with his conduct as general counsel for Defendant in Georgia. On the other hand, the Court can only assume that Lessner realized the potential ethical impropriety involved in contacting Wiggins himself after learning Wiggins was represented by counsel, so Lessner had Hodges attempt the call. It is sad to see any

lawyer engage in such a transparent effort to circumvent the rules of ethics. This conduct is yet another example of the disregard for Wiggins' interests exhibited by Defendant's management.

Finally, Defendant argues this litigation was unnecessary and that Plaintiffs "jumped the gun" in bringing this action. In his testimony, Terlizzi insisted that if only Wiggins or his parents had contacted him after the transaction was closed and explained Joshua's particular problem, he would have "worked something out" with them. As evidence of its willingness to avoid a fight, that is to "work something out," Defendant points to its last-minute concession and willingness to rescind the contract without seeking restitution for the $17,699 payment received and spent by Wiggins. Or as Defendant's counsel put it, "[i]f Peachtree was out to take advantage of Wiggins it would not have made this offer and would have insisted that Wiggins return the $17,699.00 or it would have sought to enforce its rights to receive Wiggins' payments." Defendant's Trial Brief, p. 40.

To say Defendant's argument is disingenuous is an understatement. Even after receiving the letter from counsel clearly stating that Wiggins had suffered a head injury and was not sure exactly what had transpired in the transaction, general counsel for Defendant authorized a lawsuit be filed against Wiggins in New Jersey, a forum in which Wiggins could not reasonably be expected to appear or defend his rights. The complaint filed there not only clearly sought to enforce Defendant's rights, it included a claim for punitive damages. Such is an odd method of invit-

ing another to call so something can be worked out.

Considering Defendant's actions *in toto* from the inception of Joshua's dealings with Hodges, through Defendant's lack of interest in discovering Wiggins' problem, Defendant's management's reaction to contact by Wiggins' counsel, and including the attitude displayed by Defendant's employees and executives in the courtroom, it should come as no surprise that the Court finds and concludes Defendant's conduct was outrageous and offensive to the public conscience as those terms are understood under the ICPA.

### vi. Defendant's Actions Violated the ICPA.

In summary, based upon the evidence and testimony, the Court finds and concludes Defendant knew, or at least had reason to know, that Wiggins was "reasonably unable" to protect his interests because of his head injury. Its agents also knew, or had reason to know, that Wiggins would be unable to understand the language used in its contract. Additionally, that contract was "excessively one-sided." Most importantly, the overall pattern of conduct employed by Defendant's executives and employees, culminating in the punitive damages claim lodged against Wiggins in New Jersey, shocks this Court and would certainly outrage or offend the public conscience as well. For all the above reasons, the Court unhesitatingly concludes Defendant's practices employed in this case were unconscionable as defined by the ICPA. Plaintiffs' request for damages will be considered below.[18]

---

18. As should be obvious from the Court's comments above, the Court is perhaps most disappointed with the conduct of those members of Defendant's senior management who are trained as lawyers and claim membership in the Bar. The Court will not presume the power to sanction an attorney licensed in another state and not appearing before it. However, because some of the conduct appearing from the record may have violated New Jersey court rules and the New Jersey Rules of Professional Conduct, the Court feels

## B. Breach of Fiduciary Duty.

While any damages Plaintiffs seek can be awarded under the ICPA, in the interests of judicial economy, the Court will dispose of Plaintiffs' other claims.

Plaintiffs argue Defendant assumed a fiduciary duty to Wiggins during its dealings with him, which duty it then breached. To support this claim, Plaintiffs cite a letter sent to Wiggins early on in the transaction process. Plaintiffs refer to this letter in their arguments to the Court, appropriately as it turns out, as the "Trust Me Letter." Plaintiffs Exhibit 19. It was sent to Joshua following his initial phone call to Hodges to introduce Wiggins to Defendant's "services" and to induce him into a deal. The letter is addressed to Wiggins, and contains the following relevant passages:

WHY SHOULD YOU, Josh, TRUST YOUR STRUCTURED SETTLEMENT RE–FINANCING WITH PEACHTREE SETTLEMENT FUNDING?

Since your settlement payments are one of your most valuable asset [sic] and converting your asset to a lump sum is a major decision, Peachtree Settlement Funding has developed the **Settlement Re–Financing System**™ **to help you reclaim control of your financial future. This unique system allows Peachtree Settlement Funding to provide the highest possible level of service. Our** Settlement Re–Financing System™ has three unique programs to benefit you.

1. Through our **Financial Needs Assessment & Planning Program**™ **you will have your financial needs and objectives assessed. We will**

assist you in developing a plan to help you reach your financial goals.

\*　　\*　　\*　　\*　　\*　　\*

As your personal Account Executive, I will use these unique programs to evaluate your financial needs and together we will determine the best financial option to secure your future. Don't put your financial future on hold any longer!

*Id.*[19] Hodges testified he understood and expected annuitants would be persuaded to trust him and Defendant after receiving and reading this letter. Indeed, it was his intention and goal that his clients trust him.

Plaintiffs contend that through Hodges' conversations with Wiggins, and through this letter, a fiduciary relationship arose between Defendant and Joshua whereby Defendant assumed a fiduciary duty to guard and respect the financial and other interests of Wiggins in any subsequent transaction between the parties. As the argument goes, by conducting a "sham" financial needs assessment and transacting with a person reasonably unable to protect his interests, Defendant breached that fiduciary duty.

### 1. A Fiduciary Relationship Existed.

 "Plaintiff bears the burden of proving, first, that the defendant owed him a fiduciary duty, and second, that the latter breached this duty." *Jordan v. Hunter,* 124 Idaho 899, 865 P.2d 990, 995 (App. 1993) (citing H. Henn & J. Alexander, Laws of Corporations § 219, at 628 (1983)). Ordinarily, a seller-purchaser relation-

---

compelled to forward a copy of this decision to the New Jersey State Bar Association for such further action it deems appropriate.

**19.** The Court has attempted to accurately reproduce the type size and typeface used in the original letter.

874

ship[20] would not impose a fiduciary duty upon the seller to act in the purchaser's best interests. To the contrary, a seller would presumably be expected to value its own interests over that of the buyer. However, the rules change when the seller persuades the buyer to regard the seller as a provider of personalized financial services who intends to "watch out" for the buyer's interests:

> A fiduciary relationship does not depend upon some technical relation created by or defined in law, but it exists in cases where there has been a special confidence imposed in another who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of one reposing the confidence. Oftentimes the terms "fiduciary relation" and "confidential relation" are used interchangeably; the confidential relationship which is protected in equity is synonymous with fiduciary relationship; it exists whether the relationship is technically fiduciary or merely informal, whenever one trusts in and relies on the other. In respect to either confidential or fiduciary relationship, it is possible that an unfair advantage may be taken and where one is bound to act for the benefit of another, he can take no advantage to himself; no precise language can define the limits of such relationships.

*Stearns v. Williams*, 72 Idaho 276, 240 P.2d 833, 840–41 (1952) (internal citations omitted); *see also Jones v. Runft, Leroy, Coffin & Matthews, Chtd.*, 125 Idaho 607, 873 P.2d 861, 868 (1994), citing *Stearns*, 240 P.2d at 840–41. On the other hand,

> The term fiduciary implies that one party is in a superior position to the other and that such a position enables him to

exercise influence over one who reposes special trust and confidence in him .... As a general rule, mere respect for another's judgment or trust in his character is usually not sufficient to establish such a relationship. The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party.

*Idaho First Nat. Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 824 P.2d 841, 853 (1991), quoting *Burwell v. South Carolina Nat. Bank*, 288 S.C. 34, 340 S.E.2d 786, 790 (1986)

 Throughout the trial testimony of Defendant's employees and executives, and in the written exhibits including Defendant's training and promotional materials, Wiggins in particular, and all annuitants in general, were referred to as Defendant's "clients." For example, in Hodges' telephone notes, Wiggins is repeatedly referred to as "client." Plaintiffs' Exhibit 2. In other information distributed by Defendant's management to its account executives, annuitants are referred to as "clients." Plaintiffs' Exhibit 5. In a brochure sent to Wiggins in his application packet, the following statement appears: "Peachtree Settlement Funding was established with one business objective: **to provide superior service with the utmost integrity to our clients.**" Plaintiffs' Exhibit 12, p. 9 (emphasis in original). In Defendant's Sales and Procedures manuals, annuitants are also sometimes referred to as clients. Plaintiffs' Exhibits 3 and 4.

When CEO Terlizzi was asked what the term "client" as included in all these mate-

---

**20.** As explained above, Defendant characterizes its activities as purchasing Wiggins' annuity payments. However, to the Court, Defendant's business is better viewed as selling cash and financial services. This is the characterization the Court will employ in this analysis.

rials meant to him, after an appreciable pause, the executive indicated he placed no particular significance on the use of the term and that he "hadn't really thought about it." Others in the industry apparently have thought about it. The guidelines promulgated by the National Association of Settlement Purchasers, to which Defendant adheres as a matter of business policy, consistently refer to the persons with whom their members do business as "customers" or "consumers," not "clients." Plaintiffs' Exhibit 6.

To the Court, there is an important difference between regarding another as a client as compared to a customer. In this case, the Court might not have placed much significance on the use of the word "client" in the context of Defendant's transactions with Wiggins were it not for the fact that each and every one of Defendant's founding members is an attorney and presumably well aware of the special legal importance of this term. A "client" is "[a] person or entity that employs a professional for advice or help in that professional's line of work." Black's Law Dictionary, p. 247 (7th ed.1999). Even in a general sense, though, the term "client" may be understood to refer to "a person under the protection of another; . . . a person who engages the professional advice or services of another." Webster's Third International Dictionary, p. 422 (1993).

Unfortunately, as noted above, Joshua Wiggins remembers little about the details of his transaction with Defendant. However, he testified he does remember that Hodges told him he would get him the car and out of the house, and he remembers Hodges used the word "trust" several times during their communications. The salesman's approach was consistent with Defendant's sales manual which urges account executives to "make a friend" of the client, and to "ask them about their needs." Plaintiffs' Exhibit 3, p. 14. And if the client does not articulate a need for cash, at another point, the instructional materials urges the sales staff to "Create need! Create need!" Plaintiffs' Exhibit 5, p. 0000496.

While it is a close call, the Court concludes that under these facts it is appropriate to conclude that Defendant became a fiduciary in relation to Wiggins. Defendant went to great lengths in general, and in particular through its written materials and Hodges' personal contacts with Wiggins, to foster a special relationship of "trust" between its representatives and in its "client." Added to this mix was Defendant's knowledge and reason to know that Wiggins may be unable to exercise reasonable care in protecting his own interests. In the Court's opinion, some responsibility must accompany Defendant's actions to foster such a superior bargaining position.

It seems clear Hodges was successful in his intentional efforts to persuade Wiggins to place his trust in Hodges. Recall, when very early on in their dealings Wiggins expressed some hesitation about entering any transaction, Hodges seemed proud to proclaim he could "put his head back on the straight and narrow and get him focused on the car and getting ahead in life," so much so that Wiggins actually thanked Hodges for "helping him out." Plaintiffs' Exhibit 2. Hodges' influence is also evidenced by Wiggins compliance with Hodges' instruction to open a new bank account. All this followed, of course, Hodges' written contact with Joshua in the "Trust Me" letter.

While no technical, statutory fiduciary relationship may exist here, under these peculiar facts, based upon Defendant's agents' actions and appreciation of Joshua's vulnerability, a fiduciary relationship was created as to Wiggins. Therefore,

Defendant assumed fiduciary duties in its dealings with Joshua.

### 2. Defendant Breached its Fiduciary Duty.

"[W]here one is bound to act for the benefit of another, he can take no advantage to himself . . . ." *Stearns,* 240 P.2d at 841 (citation omitted); *Jones,* 873 P.2d at 868. A fiduciary is "bound to act in good faith and with due regard to the interest of one reposing the confidence." *Id.*

■ Here, Defendant, through Hodges, aggressively encouraged Wiggins to trust Defendant with his financial future. At the same time, Defendant knew and had reason to know Wiggins was a person who had suffered a head injury, was unemployed and living at home, and whose mother was so adamantly opposed to the transaction as to have consulted an attorney. On this basis, is it unfair to expect Defendant's agents to refrain from taking away the client's regular and only source of monthly income in favor of a deeply discounted cash payment? Should Hodges be encouraging Joshua to purchase an automobile to spite ("screw") his parents?

Given the relationship Hodges and Defendant intentionally fostered with Wiggins, at least some additional inquiry was mandated. None was made. Instead, as noted before, while nothing prevented it from doing so, Defendant failed to take any necessary steps to determine whether a sale of his annuity payments was in fact consistent with his best interests.

For instance, when Eva Hale told Hodges the family's attorney had said the proposed transaction was "illegal," couldn't Hodges be expected to inquire regarding the identity of the attorney, and to determine the basis for the lawyer's opinion? Instead, Hodges described Mrs. Hale in words Defendant's management regrets as a "but head [sic]." He also presumed she was a liar. He then set about attempting to bypass Mrs. Hale by communicating with Joshua at a different address, and again by instructing Wiggins to open a new savings account without Eva Hale's involvement.

Apart from Mrs. Hale's statements to a zealous, ambitious Hodges, for its part, Defendant's legal department disregarded a document indicating Wiggins had suffered a head injury. If Defendant truly considered Joshua its "client," and intended that he "trust" Defendant with his financial goals, is it too much to expect that some employee of Defendant inquire about the nature and severity of the injury?

At every step, Defendant seemed to employ measures, not designed to protect Wiggins in such dealings, but to ignore any information which might suggest the transaction was not in his best interests. While expressly offering to do so, at no time did Defendant's representatives actually conduct the promised "financial needs analysis" to determine what was best for the client. To the contrary, the record demonstrates that any information obtained from a client in a transaction was hoped by Defendant's management to be useful in forging a second advantageous deal: "second deals are quite easy and usually very profitable. Also, all objections have been overcome and *trust* has been established." Defendant's Sales Manual, Plaintiffs' Exhibit 3, pp. 12–13, 16 (emphasis added).

Clearly, Defendant's policy was to make deals as profitable as possible, rather than to be concerned with performing the promised "financial needs assessment" or following up with "due diligence" to determine what type of transaction would be in the annuitant's best interests. While there is nothing immoral with hard dealing in business, there is a problem with entic-

ing those who cannot protect themselves to "trust" Defendant as a precursor to sealing the contract. Based on the extraordinary facts of this case, the Court concludes that a fiduciary relationship between Wiggins and Defendant arose as a result of Defendant's actions, which duty Defendant then breached in consummating the annuity purchase transaction.

## C. Constructive Fraud.

■■■■ Plaintiffs also claim that Defendant's actions in entering into the transaction with Wiggins constituted constructive fraud, specifically, in claiming to perform a "financial needs analysis" which was never actually done. "An action in constructive fraud exists when there has been a breach of a duty arising from a relationship of trust and confidence, as in a fiduciary duty." *Hines v. Hines*, 129 Idaho 847, 934 P.2d 20, 26 (1997). "[C]onstructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust or confidence and resulting in damage to another. Constructive fraud usually arises from a breach of duty where a relation of trust and confidence exists." *Mitchell v. Barendregt*, 120 Idaho 837, 820 P.2d 707, 714 (App:1991), citing *McGhee v. McGhee*, 82 Idaho 367, 353 P.2d 760, (1960). Moreover, " '[n]either actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.' " *McGhee*, 353 P.2d at 762, quoting 37 C.J.S. Fraud § 2, p. 211.

■■■ The Court has concluded above that a fiduciary relationship existed between Defendant and Wiggins, and that Defendant breached the duty of fair dealing it assumed with respect to that relationship. It is therefore no stretch, given *Hines*, to determine that Defendant is also liable for constructive fraud.

As previously mentioned, Defendant's "financial needs analysis" consisted of asking the "client" (Wiggins) what he wanted to buy, then figuring out how much Defendant would have to offer him for his annuity payments to make the purchases. No consideration was given the fact that Wiggins was unemployed, nor inquiry made as to the nature of Wiggins' head injury. Moreover, Hodges cared not whether trading his stable stream of annuity payments for cash was actually consistent with Joshua's best interests. Instead, to complete its supposed due diligence, Defendant was satisfied in asking Wiggins whether he was incompetent and whether he could be employed, and in obtaining signatures to these answers to create the requisite paper trail.

The Court concludes that Defendant promised to conduct a "financial needs analysis" and failed to make good on that promise, choosing instead to close a transaction which proved very detrimental to its "client." Neither Defendant's promised "financial needs analysis" nor its "due diligence" embodied anything close to what those terms imply. Because Defendant failed to provide the promised services after having taken on a position of trust and confidence with Wiggins, Defendant should be liable for constructive fraud.

## D. Breach of the Implied Covenant of Good Faith and Fair Dealing.

In their Complaint, Plaintiffs assert the following:

There is incumbent upon any party seeking to enter into a contractual relationship with another party an implied covenant imposed by law which obligates such party to deal fairly and in good faith in its negotiations and dealings with the other party. Among other things, this implied covenant of good faith and fair dealing requires that each

party act with honesty in fact, and in a manner consistent with reasonable standards of business ethics and behavior. Peachtree was subject to this implied covenant in its negotiations with Wiggins leading up to the execution of the contract to purchase the annuity.

Amended Complaint (Docket No. 129), pp. 23–24, ¶ 69. Plaintiffs further assert that this implied covenant was violated when Defendant "extract[ed] contractual concessions which were unconscionable or so unfairly one-sided as to make the duties and obligations issued by Wiggins fundamentally unfair," and later, when it sought to "invoke and enforce provisions of the contract which were calculatedly unfair, unconscionable and one-sided." *Id.*, p. 24, ¶¶ 70–71.

▉▉▉▉ Plaintiffs misstate the law. The implied covenant of good faith and fair dealing constitutes a promise made implicit by law in every contract. It is a covenant in contract, not in tort. *Bliss Valley Foods, Inc.*, 824 P.2d at 863, citing *Burton v. Atomic Workers Federal Credit Union*, 119 Idaho 17, 803 P.2d 518 (1990). The covenant requires that the parties perform, in good faith, the obligations imposed by their agreement, and a violation of the covenant occurs only when either party violates, nullifies or significantly impairs any benefit of the contract. *Idaho Power Co. v. Cogeneration, Inc.*, 134 Idaho 738, 9 P.3d 1204, 1216 (2000), citing *Bliss Valley Foods*, 824 P.2d at 863. No covenant will be implied which is contrary to the terms of the contract negotiated and executed by the parties. *Id.*, citing *First Security Bank of Idaho v. Gaige*, 115 Idaho 172, 765 P.2d 683, 687 (1988); *Clement v. Farmers Ins. Exchange*, 115 Idaho 298, 766 P.2d 768, 770 (1988). Since it is a contractual term, the implied covenant does not arise until a contract exists and therefore cannot apply to negotiations.

▉▉▉▉ Plaintiffs have not alleged breach of contract as one of their causes of action. Without a breach of the express terms of a contract, the Court will "necessarily conclude that there was no breach of the implied covenant." *See Totman v. Eastern Idaho Technical College*, 129 Idaho 714, 931 P.2d 1232, 1236 (App.1997), citing *Clement*, 766 P.2d at 770; *Olson v. Idaho State University*, 125 Idaho 177, 868 P.2d 505, 510 (App.1994). "[B]y merely standing upon the terms of a contract, a party does not fail to deal honestly with another party regardless of how onerous the terms of that contract may be." *Bliss Valley Foods*, 824 P.2d at 863.

▉▉▉▉ Plaintiffs' complaints about the one-sidedness of the contractual terms, and the subsequent enforcement of them, present issues not contemplated by the implied covenant. As unfair as the terms of the contract in this case may be, it cannot be said that Defendant sought to enforce its terms unfairly. The Court therefore concludes Defendant did not breach the implied covenant of good faith and fair dealing.

## E. Intentional Infliction of Emotional Distress.

▉▉▉▉ Plaintiffs assert that Defendant's actions caused Wiggins and the Hales emotional distress. While no doubt, as a practical matter, this allegation is correct, in order to recover damages at law for such a claim, the Plaintiffs must prove that: " '(1) the conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress was severe.' " *Roper v. State Farm Mut. Auto. Ins. Co.*, 131 Idaho 459, 958 P.2d 1145, 1149 (1998), quoting *Spence v. Howell*, 126 Idaho 763, 890 P.2d 714, 725 (1995).

In this case, Plaintiffs have established that Defendant's conduct was at least reckless, if not intentional, in proceeding with the transaction despite knowledge and reason to know of Wiggins' head injury, lack of employment, and the living arrangements with his parents. Despite the red flags about dealings with Wiggins, Defendant's salesman and legal staff plunged headlong into an unconscionable transaction. So, too, Plaintiffs have established that the actions of Defendant's representatives were extreme and outrageous, as detailed above in the discussion regarding the ICPA, and below in the Court's discussion of damages.

 However, Plaintiffs did not produce evidence or testimony necessary to demonstrate that Defendant's agent's conduct was so severe as to give rise to an emotional distress claim. Liability for infliction of emotional distress only results if it is so severe "that no reasonable person could be expected to endure it." *Davis v. Gage*, 106 Idaho 735, 682 P.2d 1282, 1288 (App.1984), citing Restatement (Second) of Torts, § 46, comment j (1965). The emotional response must be severely disabling, or hamper the performance of a person's daily activities. *Id.; Walston v. Monumental Life Ins. Co.*, 129 Idaho 211, 923 P.2d 456, 464–65 (1996), citing *Davis*, 682 P.2d at 1288. Both Wiggins and Mrs. Hale testified that Defendant's actions had been extremely upsetting, financially debilitating for Joshua, and caused the family expense and turmoil. However, neither testified they were rendered unable to function in their day-to-day activities, or that the stress caused by Defendant's actions was severely disabling. While the Court does not condone, but rather condemns, Defendant's actions, the requisite level of emotional distress to be actionable

under Idaho law was not shown in this case.

### F. Intentional Interference with Contractual Relations.

 Plaintiffs assert that Defendant tortiously interfered with the contractual relationship between Wiggins and Safeco, causing Wiggins to breach the anti-assignment provisions of the contract. In order to prevail on such a claim, Plaintiffs must demonstrate that "1) there was a contract in existence; 2) the defendant knew of the contract; 3) the defendant intentionally interfered with the contract, causing a breach; and 4) injury to the plaintiff resulted from the breach." *Magic Valley Truck Brokers, Inc. v. Meyer*, 133 Idaho 110, 982 P.2d 945, 950 (App.1999), citing *Ostrander v. Farm Bureau Mut. Ins. Co.*, 123 Idaho 650, 851 P.2d 946, 950 (1993); *Barlow v. International Harvester Co.*, 95 Idaho 881, 522 P.2d 1102, 1114 (1974). However, "[t]he general rule is that a party cannot tortiously interfere with its own contract." *Ostrander*, 851 P.2d at 950 (citations omitted).

 Here, Plaintiffs assert that Defendant interfered with the contract between Wiggins and Safeco, causing Wiggins to breach that contract, and suffer damage. However, even assuming Wiggins' allegations are correct, he was a party to the contract with Safeco. Therefore, he cannot seek damages from Defendant for his own breach of that contract.[21] Plaintiffs' have shown no basis here for any claim against Defendant for interfering with a contract under Idaho law.

### G. Damages.

In their original complaint, Plaintiffs prayed for several remedies: a judgment

21. The Court expresses no opinion whether Safeco could appropriately pursue Defendant on a claim for intentional interference with its contractual relationship with Wiggins.

rescinding the contract and finding that Defendant is not entitled to restitution; an award of compensatory damages and attorneys fees and costs; and, assuming a proper showing could thereafter be made, an award of punitive damages. On January 17, 2001, consistent with Idaho law and practice, the Court granted Plaintiffs' motion to amend their complaint, finding a sufficient showing had been made to allow Plaintiffs to include a prayer for punitive damages.

▉ As noted, just prior to trial, Defendant voluntarily agreed to rescind the contract and to forego any alleged claim for restitution of the contract price. Defendant's Response to Motion for Entry of Judgment, Docket No. 157. For that reason, Plaintiffs' request for rescission and relief from any duty to make restitution is moot.

Plaintiffs have a right to damages, though. For the reasons set forth above, the Court has concluded Defendant is liable to Plaintiffs for multiple violations of the ICPA, breach of fiduciary duty, and constructive fraud. The Court quantifies the damages awardable to Plaintiff below.

### 1. Compensatory Damages.

In exchange for the sale of his stable stream of annuity payments, Wiggins received $17,699 in cash from Defendants. Not surprisingly, because of his mental disabilities, and because his parents' efforts to protect him had been frustrated, Joshua spent the money unwisely, incurred unnecessary debt, and ended up broke. In addition, in order to deal with Wiggins' debts, and with Defendant's New Jersey law suit, Wiggins and the Hales had to retain counsel to assist in the filing of Joshua's Chapter 13 petition. They also incurred fees for Dr. Corgiat's examinations and testimony in court, as well as attorney fees and costs for the conservatorship proceeding.

To the Court, the $17,699 Wiggins actually received from Defendant, without the corresponding loss of any of his annuity payments, adequately offsets any out-of-pocket expenses incurred as a result of Wiggins' imprudent spending of that money. Additionally, the fact that Wiggins has lacked access to his annuity payments for the past two years does not appear to warrant further compensation either, given that Wiggins has arguably received the benefit of the present value of that money.

On the other hand, the costs and expenses of dealing with the "mess" caused by Defendant's intrusion into this family's life should be redressed. The expenses incurred for Joshua's attorneys in the bankruptcy case and conservatorship proceeding, and Dr. Corgiat's fees for Wiggins' mental examination are legitimate items of damage.

▉ Unfortunately, Plaintiffs did not itemize nor submit specific proof in support of the amount of any of the compensatory damages they seek to recover. This is clearly their burden, and absent competent proof, the Court will not speculate as to those amounts. *Crosby v. Rowand Machinery Co.*, 111 Idaho 939, 729 P.2d 414, 418 (App.1986) (citing *Martsch v. Nelson*, 109 Idaho 95, 705 P.2d 1050 (App.1985)).

▉ However, with respect to their claims under the ICPA, Plaintiffs have an alternative remedy, despite having not proven the specific amount of their compensatory damages. The Legislature recognized that in cases of consumer fraud, it is frequently difficult for the victim to prove substantial damages. Therefore, under the ICPA, Idaho Code § 48–608(1), a court is authorized to award actual damages or $1,000, whichever is greater, if it determines a party has violated the Act.

Consistent with the policies of the Act, the Court elects to award statutory damages in this instance. *See, e.g., In re Barker*, 251 B.R. 250, 266 (Bankr.E.D.Pa.2000) (plaintiff's failure to quantify damages does not preclude an award of statutory damages); *Martin v. Cahill*, 90 Or.App. 332, 752 P.2d 857, 859 (1988) (if there is no evidence as to the amount of actual damages, the court may award statutory damages).

Based on the discussion above, the Court finds at least six distinct violations by Defendant of the ICPA occurred in this case: (1) obtaining Wiggins' signature on two blank, notarized documents, so that Defendant could fill in the information later; (2) disregarding information reasonably indicating Wiggins should not sell his annuity payments including the document indicating Wiggins had suffered a head injury, Eva Hale's statements to Hodges, and the fact that he was unemployed and living at home; (3) obtaining an "affidavit of employability" from Wiggins to evade Defendant's own policy of not purchasing annuity payments from unemployed or unemployable individuals; (4) failing to conduct the promised "financial needs analysis"; (5) attempting to contact Wiggins directly after receiving a letter indicating Wiggins was represented by counsel; (6) suing Wiggins in New Jersey for alleged diversion of payments despite the contractual provision shielding Wiggins from liability if the annuity issuer refused to honor the assignment, and including a claim for punitive damages without any good faith basis in fact or law. Under the statute, the Court finds Plaintiffs are allowed to recover the statutory penalty of $1,000 for each discrete violation of the ICPA, for a total of $6,000. *United States v. Reader's Digest Assoc., Inc.*, 662 F.2d 955, 966 (3rd Cir.1981), cert. denied, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982) (in construing the Federal Trade Commission Act, 15 U.S.C. § 45, each deceptive solicitation sent to individual consumers in a mass mailing was deemed a separate violation); *In re Barker*, 251 B.R. 250, 266 (Bankr.E.D.Pa.2000) (holding that statutory damages were appropriate for each discrete violation of that state's deceptive trade practices act).

■ With respect to their common law claims of breach of fiduciary duty and constructive fraud, Plaintiffs similarly failed to adequately prove the amount of those damages flowing from Defendant's tortious conduct. Therefore, Plaintiffs will be awarded nominal damages, in the amount of $100, in recognition of Defendant's breach of fiduciary duty and constructive fraud.

## 2. Punitive Damages.

In Idaho, proving entitlement to punitive damages ordinarily requires proof of " 'extreme deviation from reasonable standards of conduct' " or " 'oppressive, fraudulent, wanton, malicious or outrageous conduct.' " Idaho Code § 6–1604(1); *Mac Tools, Inc. v. Griffin*, 126 Idaho 193, 879 P.2d 1126, 1129 (1994), citing *Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 665 P.2d 661 (1983); *Soria v. Sierra Pac. Airlines, Inc.*, 111 Idaho 594, 726 P.2d 706 (1986); *Linscott v. Rainier Nat. Life Ins. Co.*, 100 Idaho 854, 606 P.2d 958 (1980). This common law standard is different, however, than the standard for an award of punitive damages under the ICPA. "The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper in cases of repeated or flagrant violations." Idaho Code § 48–608(1). Moreover,

> I.C. § 48–608 contains its own remedies.... The enactment of I.C. § 48–608 is not an abrogation of existing common law relating to punitive damages, nor is

it a codification of the common law. Rather, the legislature has created something entirely new, i.e., a new remedy for repeated and flagrant violations of the ICPA.

*Mac Tools,* 879 P.2d at 1131.

■■■■ The purpose of punitive damages is to punish unlawful conduct and to deter similar conduct in the future. *Robinson v. State Farm Mut. Auto. Ins. Co.,* (2000). The amount imposed "should be tailored toward making the cost of such conduct uneconomical." *Id.*

■■■ The Court above has attempted to carefully detail how Defendant's dealings with an impressionable, mentally deficient Joshua Wiggins ran afoul of the statutes and was wrongful. In all respects, Defendant's conduct represents an awful example of lack of corporate conscience.

A person like Joshua Wiggins, who as a result of his serious, permanent brain injuries, was impulsive, prone to stimulus-bound behavior, and lacked executive functioning skills, had no chance as against Defendant's crafty, avaricious salesman. In this arena, Hodges was dangerous to all but the most wary of Defendant's potential financial "clients." He quickly, slickly "did the deal." He convinced Joshua to "trust" him. He supposedly analyzed Wiggins' financial goals and needs, somehow concluding Wiggins' immature desire to own a hot car and to live in his own apartment were best for him, even though Wiggins was unemployed. He "put his head back on the straight and narrow" when Wiggins wavered. He presumed Joshua's mother was a liar when she told him about Joshua's head injury and that a lawyer had condemned the transaction. He disrespected Wiggins' parents, characterizing them as "but heads [sic]."

So, too, Defendant's legal department had an opportunity, but knowingly failed, to avert this fiasco. They had a document in their possession indicating Wiggins had suffered a head injury, but failed, because of company policies discouraging such, from inquiring further about the extent of the injuries.

Finally, at trial, Defendant's executives, most of whom are trained as lawyers, demonstrated remarkable disdain for the seriousness of their company's transgressions, and insensitivity to the Hale family's predicament. The CEO failed to acknowledge that, under these circumstances, any significant wrong had occurred. While the company's policy's were "under evaluation," he was vague and imprecise as to what changes were planned. Defendant's general counsel helped little by instructing Hodges to contact Wiggins after being advised he was represented by an attorney looking into the circumstances of the transaction. And in spite of the CEO's professed desire to "work something out" with the Hales and Wiggins if they had merely asked to do so, general counsel instructed company lawyers to sue Joshua in New Jersey for punitive damages without any apparent basis for such a claim.

Terlizzi and Lessner consistently asserted that the Court must look at the "totality of the circumstances" in determining whether Defendant's and its agents' dealings with Wiggins were such as to warrant an award of punitive damages. Unfortunately for them, however, it is the totality of the circumstances which illuminate the egregious nature of Defendant's actions. Perhaps each of the actions viewed independently might not be enough to warrant the imposition of punitive damages. However, when taken as a whole, it is clear that Defendant knew or should have known that the transaction would be harmful to Wiggins.

The Court is confident it understands the Idaho Legislature's use of the term "flagrant" in the ICPA. The Court is similarly assured that the acts of Defendant's agents in this case fall within the definition of that term in any ordinary sense. So there is no doubt, the Court concludes Defendant's officers and employees committed offenses under the consumer protection statute that were so blatantly and conspicuously at odds with what is right as to appear to flout the law. Defendant repeatedly and flagrantly violated the ICPA, from the very beginning of the transaction, to the attempts to collect the debt from Wiggins via the ACH procedure, and finally through the lawsuit brought in New Jersey.

For the same reasons, the Court also finds that Defendant's actions satisfy the common law standard for an award of punitive damages as an "extreme deviation from reasonable standards of conduct" as well as "oppressive, fraudulent, wanton, malicious or outrageous conduct." These acts should be censured. An award of punitive damages is appropriate in this case both to punish the Defendant's conduct and to deter any future similar activities, both under the ICPA, as well as for the common law claims of breach of fiduciary duty and constructive fraud.[22]

To counter Plaintiffs' claims that a substantial punitive damages award is necessary to deter Defendant from such similar conduct in the future, Defendant cite a new Idaho statute which places assignment of most structured settlement payment rights within the purview of Article 9 of the Uniform Commercial Code. Idaho Code § 28–9–109(d)(13)(A). Under this new statute, no sale, pledge, assignment, or other transfer of structured settlement payments is effective unless a court order is first obtained approving of such transfer:

1. No direct or indirect transfer of structured settlement payment rights shall be effective and no structured settlement obligor or annuity issuer shall be required to make any payment directly or indirectly to any transferee of structured settlement payment rights unless the transfer has been approved in advance in a final court order based on express findings by such court that:

A. the transfer is in the best interest of the payee,[23] taking into account the welfare and support of the payee's dependents;

B. the payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received such advice or knowingly waived such advice in writing; and

C. the transfer does not contravene any applicable statute or the order of any court or other government authority.

Idaho Code § 28–9–109(d)(13)(B)(iii)(1). Additionally, the requirement for a court order cannot be waived. Idaho Code § 28–9–109(d)(13)(B)(vi)(1).

---

22. Although the Court awarded only nominal damages for the breach of fiduciary duty and constructive fraud claims due to Plaintiffs' failure to quantify their actual damages at trial, in Idaho, an award of nominal damages will support a punitive damages award. *Crosby v. Rowand Machinery Co.*, 111 Idaho 939, 729 P.2d 414, 419 (App.1986); *Young v. Scott*, 108 Idaho 506, 700 P.2d 128, 134 (App. 1985). "The foundational requirement is that some legally protected interest be invaded." *Davis v. Gage*, 106 Idaho 735, 682 P.2d 1282, 1286 (App.1984).

23. "Payee" is defined as "an individual who is receiving tax free payments under a structured settlement and proposes to make a transfer of payment rights thereunder." Idaho Code § 28–9–109(d)(13)(B)(i)(8).

Based of this statute, Defendant argues that an award of punitive damages is not necessary here to deter Defendant from engaging in improper deals in the future because a court will be responsible for making the final decision as to the propriety of the transaction. While a statute might go a long way towards ensuring fair dealing in the future, Defendant's own actions in this case suggest the mere existence of a statute is no guarantee of compliance. The ICPA was on the books long before Defendant entered into this transaction with Wiggins,[24] something the Court presumed Defendant's management knew given its decision to do business with consumers in Idaho. Even so, Defendant employed the necessary tactics to "do the deal" in spite of the ICPA such as to warrant an award of punitive damages. Given Defendant's proclivity to ignore the law, the Court lacks confidence that a new statute will alone prevent Defendant from engaging in improper methods or practices, or in repeatedly and flagrantly violating the ICPA in the future.

Finally, it is important to note that each of Defendant's executives who testified in this action essentially ratified and condoned the actions taken by Hodges and the legal department in connections with the Wiggins deal. Additionally, Terlizzi and Lessner testified that although they have tried very hard, they have been unable to determine procedures which the company could put in place to prevent such a situation from occurring again. When asked whether any of the "due diligence" requirements have been changed as a result of the transaction with Wiggins, Terlizzi did not know, and indicated they are still trying to figure out what they can do better. It is this utter lack of introspection and corrective action after some three years which causes the Court to believe that if a another Joshua Wiggins contacts Defendant, it's representatives would likely behave no differently. Because of the cavalier attitude of Defendant's management, and its failure to make changes to protect the mentally deficient in its policies, Defendant should be sanctioned by an award of punitive damages in an amount sufficient to deter similar conduct in the future.

Setting the amount of the punitive damages, however, presents a challenge. Plaintiffs insist that the Court must inflict such a financial loss against Defendant so as to, in effect, bring the company to its financial knees, never to consider such misdeeds again. Plaintiffs adduced evidence at trial about Defendant's substantial annual gross income for the Court's consideration in setting any damage award. Admittedly, the Court was impressed by the extent of business transacted by Defendant in such an arcane market.

On the other hand, Defendant's executives plead poverty, relatively speaking. While Defendant generates a large income from its various activities,[25] its officers emphasize it makes little profit due to its high cost-of-funds and operating expenses.

■ A bankruptcy court is surely sensitive to the costs of doing business, and the difference between gross income and net profit. However, it is also true that the amount of operating costs, and therefore net profit, is dependent upon numer-

---

**24.** The ICPA was enacted in 1971, and most recently amended in 1993.

**25.** In addition to buying structure settlement payments, Defendant also generates substantial revenues from purchasing lottery winnings from those unwilling or unable to wait on long-term payouts. Defendant also buys paid-up life insurance benefits from the elderly. The numbers demonstrate the existence of a considerable market for Defendant's services and products.

ous factors, including the abilities of those selected to lead the company and the quality of that management's decisions. As reflected above, the decisions made by Defendant's management in this case were lacking. Moreover, the Court can only wonder how much of Defendant's income and profit was generated from transactions with others like Joshua Wiggins.

At trial, Defendant's tax returns and financial statements were introduced for the years 1997–1999. The financial statements, prepared by a national accounting firm in accordance with Generally Accepted Accounting Principles, Plaintiffs' Exhibits 17a–17e, show that in 1997, Defendant's gross revenues were $2.48 million, with net income of $100,862. By 1999, the most recent year for which financial data was introduced at trial, Defendant's gross revenues increased to $26.95 million, with net income of $11.25 million. Plaintiffs' Exhibits 17a and b. In 1997, the members' equity in this limited liability company was $368,714; it jumped to $20.38 million in 1999. *Id.* Defendant has also had no shortage of cash, either. At the end of 1997, Defendant had $320,380 in cash; at the end of 1999, its cash totaled $3.96 million. *Id.*

Defendant insists that its financial statements, even if professionally prepared, do not accurately represent the company's ability to respond to an award of punitive damages. Terlizzi testified that from its inception, the Defendant's members have received no distributions and that in the third and fourth quarters of 2000, the company had cash flow problems. Additionally, Terlizzi pointed to the 1998 and 1999 tax returns, which all show substantial losses in net income. Plaintiffs' Exhibits 17d and 17e. Terlizzi did not mention the company's total assets as listed on Defendant's tax returns during his testimony. In 1997, the total assets are listed at $1.25

million; this figure soared to nearly $78 million in 1999. Plaintiffs' Exhibits 17c and 17e. Defendant spent $3.7 million on advertising in 1998 and another $4.7 million in advertising in 1999. Plaintiffs' Exhibit 17c and 17d.

Finally, the Court wonders why, if Defendant's financial condition is questionable, it has been able to obtain the extensive credit it has in the financial market. In 1998, Defendant's credit facility (essentially a line of credit) was $50 million, whereas it has recently increased to more than $120 million. Despite attempts by its executives to portray a more dismal financial portrait, the Court concludes Defendant is financially stable, especially considering it was just started in 1997. Defendant can, and should, respond to a substantial award of punitive damages.

After much deliberation, however, the Court concludes it is not interested in putting Defendant out of business, or depriving America of what Defendant's leaders describe as a legitimate and necessary financial services niche. Conversely, the Court is also not willing to see Joshua Wiggins' circumstances repeated. Had Defendant completed its deal with Wiggins, it would have generated a gross profit on the transaction of approximately $36,982. Admittedly, Defendant was not successful in realizing this profit here, but not because of anything under it's control. Had it had its way with Joshua, and had Plaintiffs not sued Defendant, Defendant would be collecting his settlement annuity payments even today. Therefore, the Court concludes it appropriate to tie the award of punitive damages in this case to the amount Defendant would have received had it "done the deal" with Wiggins.

To express the Court's condemnation for the tactics employed in this case, and to punish Defendant's violation of Idaho law, and to discourage Defendant from engag-

ing in similar activities in the future, the Court, in the exercise of its discretion, concludes an award of punitive damages against Defendant and in favor of Plaintiff is appropriate equal to five times the amount of anticipated gross profit, or $184,910.

### 3. Attorney Fees and Costs.

██ A prevailing party may recover attorney fees and costs incurred in prosecuting a state law claim in an adversary proceeding in a bankruptcy case, if that party would have been entitled to a such a recovery under applicable state law. *Jenkins v. Sroufe (In re Sroufe)*, 01.1 I.B.C.R. 38, 261 B.R. 35, 38 (Bankr.D.Idaho 2001), quoting *Ford v. Baroff (In re Baroff)*, 105 F.3d 439, 441 (9th Cir.1997). Pursuant to Idaho Code § 48–608(4), "[c]osts *shall* be allowed to the prevailing party unless the court otherwise directs. In any action brought by a person under this section, the court *shall* award, in addition to the relief provided in this section, reasonable attorney's fees if he prevails" (emphasis added). In addition, the Court concludes this action is also subject to Idaho Code § 12–121, which provides, "[i]n any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties, provided that this section shall not alter, repeal or amend any statute which otherwise provides for the award of attorney's fees." Under either Idaho Code § 48–608(4) or Idaho Code § 12–121, recovery of fees and costs is allowed by the prevailing party in proper circumstances.

██ It should be clear that Plaintiffs are the prevailing party in this action. The Court therefore concludes Plaintiffs are entitled to an award of reasonable attorney fees and costs incurred in prosecuting this action. Plaintiffs shall file a separate motion for allowance and approval of attorneys fees and costs itemizing the attorney time and amount of fees and expenses claimed under the appropriate statutes and rules. In light of the extent of the time and services which Plaintiffs' lawyers and experts were required to expend in this action, the Court fully expects Plaintiffs' claim for attorneys fees to be substantial. However, if Defendant objects thereto, the motion and objection shall be set for hearing before the Court.

### IV. Conclusion.

This is a sad story.

Joshua Wiggins was a healthy, happy teenager who received a debilitating brain injury. To be sure, Defendant did not cause Joshua's accident or injuries. However, after his tragic accident, and in part because of his unfortunate encounter with Defendant, Wiggins' life has been complicated and difficult. After observing Joshua in Court, and listening to his testimony, it is clear he is depressed about these events, feels guilty about having gotten "thick" with the likes of Defendant, and as a result, lacks self-esteem.

When Joshua responded to Defendant's television solicitations to sell his annuity payments, he was, because of his serious brain injuries, incapable of exercising the judgment necessary to properly protect his interests in any transaction with Defendant. He was also unable to understand the terms of Defendant's voluminous contract. Before the deal was done, Defendant's enterprising salesman, Hodges, was informed of Wiggins' deficiencies and told by Joshua's mother that the transaction should not proceed. Instead of reacting with caution and thinking of Wiggins' welfare, Hodges successfully persuaded Wiggins to trust him to look out for his interests, and helped Joshua circumvent his parents' legitimate concerns. Moreover, Defendant's legal department had possession of information which should have led

Defendant's staff to further inquire concerning Joshua's condition, and to question the propriety of any sale of his payment rights.

As it turns out, while Wiggins received some cash payment from Defendant for his annuity payments, he and his family suffered considerably as a result of the exchange. When contacted by Wiggins' lawyers for information, Defendant's reaction was to sue Joshua in New Jersey for punitive damages.

Put simply, Defendant's conduct amounted to a breach of fiduciary duty, constructive fraud, and violated numerous provisions of the Idaho Consumer Protection Act. Plaintiffs, while not submitting proof of the precise amount of their actual losses, are entitled to recover from Defendant statutory damages of $6,000, nominal damages of $100, and punitive damages of $184,910, together with reasonable attorneys fees and costs incurred in this action.

The Court genuinely hopes Wiggins and the Hales recover from this regrettable episode. So, too the Court hopes Defendant's management understands that even in the competitive environment of modern business, unconscionable practices can not be tolerated.

Counsel for Plaintiffs may submit a form of judgment for entry by the Court. Counsel for Defendant shall approve the form.